Arthur Nickolas NEWSOME, et al.,
Plaintiffs-Appellants,

v.

BATAVIA LOCAL SCHOOL DISTRICT,
et al., Defendants-Appellees.

No. 87–3091.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 7, 1987.

Decided March 30, 1988.

R. Gregory Park, Lead Counsel (argued),
Lisa E. O'Rear, Legal Aid Soc. of Clermont
Co., Batavia, Ohio, for plaintiffs-appellants.

William J. Ennis (argued), Cincinnati,
Ohio, for Batavia Local School Dist.

Before JONES and GUY, Circuit Judges, and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

This is an appeal from an order of the District Court for the Southern District of Ohio denying plaintiff-appellant Arthur Newsome's motion for a temporary restraining order and a preliminary injunction and dismissing his entire case on the merits. On appeal, Newsome argues that the district court erred in holding that the procedures employed by the defendant-appellee Batavia School District in expelling him from school did not violate his right to procedural due process of law under the fourteenth amendment. The procedural defects alleged by Newsome involve the denial of his request to cross-examine the witnesses against him, the denial of his right to an impartial tribunal, and the consideration, by that tribunal, of evidence not made available to Newsome. We determine, in the first instance, that Newsome lacks standing for some of the relief he seeks. On the merits, we conclude that, while Newsome's right to procedural due process was not violated by the school district's denial of his request to cross-examine the witnesses against him nor by the composition of the hearing panel, Newsome was deprived of due process by the panel's consideration of evidence of which he was not apprised.

## I.

Upon filing of this complaint in the district court, Newsome was a sixteen-year-old junior at Batavia High School in Batavia, Ohio. On November 3, 1986, Newsome was summoned to the office of the principal, Daniel Swart, and accused of possessing and offering a marijuana cigarette for sale on high school property. Newsome denied the charges and asked the source of the accusations. The principal then informed him that the information had been obtained through interviews with two students but refused to identify them.

On November 6, 1986, Newsome was informed by a school representative that the principal intended to suspend him for ten days based on his alleged possession and attempted sale of marijuana.

On November 10, 1986, a suspension hearing was held before Batavia School Superintendent James Fite. Newsome, his mother, Don Schlunk of the Clermont County Juvenile Court, and the principal were all present. The principal recounted the substance of the student accusations upon which Newsome's proposed suspension was based. At no time were the names of the student accusers disclosed. Apparently, at some point, the superintendent privately interviewed the two students.

The hearing was continued to November 14, 1986. At this time, Don Schlunk reported that a urinalysis which Newsome had taken was negative for drug use. A juvenile court officer then testified that there was no present need for Newsome to undergo drug counselling. She recommended that Newsome be immediately returned to school. At the conclusion of the hearing, the superintendent and principal adjourned to discuss the disposition of the case. Later that day, Newsome's mother was informed that the superintendent had decided to give Newsome a clean disciplinary record if he would accept transfer to the Live Oaks Vocational School in Milford, Ohio. Newsome declined this offer, and, on November 17, 1986, he was notified that he had been expelled from school for the remainder of the fall semester.

On November 24, 1986, the Batavia School Board met in executive session to consider Newsome's appeal of his expulsion. Newsome was represented by counsel during this hearing. The principal and superintendent led off the hearing by recounting the statements of the two accusing students. Again, they did not disclose the names of these students but affirmed their belief that the students were telling the truth. The principal stated that he did not believe the students were "out to get" Newsome and that the students were not close friends. In concluding his testimony, the superintendent stated that his decision

to expel Newsome was based solely on the statements of the two student informants. Newsome's attorney requested an opportunity to cross-examine the principal and superintendent, but this request was denied by the school board. The meeting concluded with Newsome's testifying that he did not possess or offer to sell marijuana on school property. Newsome's attorney then was allowed a closing argument.

After Newsome, his mother, and his attorney were excused, the school board, together with the principal and superintendent, reviewed the evidence in the case. Upon completing their review, the school board affirmed the superintendent's decision to expel Newsome by a unanimous vote. This decision was confirmed by a letter dated December 1, 1986. The letter stated that Newsome was expelled from Batavia High School until January 21, 1987.

On December 10, 1986, Newsome filed this action in the district court. The complaint, brought under 42 U.S.C. § 1983 and the fourteenth amendment, alleged that Newsome was denied procedural due process during the school board hearing in the following respects: (1) he was denied the opportunity to cross-examine or to even know the identities of his student accusers; (2) he was denied the opportunity to cross-examine the principal and superintendent; and (3) he was denied the right to an impartial tribunal since the school board allowed the principal and superintendent to participate in its review of the superintendent's decision to expel him. Newsome's prayer for relief requested a temporary restraining order and an injunction prohibiting school officials from enforcing his expulsion, an injunction requiring the school district to implement a disciplinary process that comports with the requirements of procedural due process, an injunction requiring the school district to provide tutorial assistance to him in making up the work he missed during his expulsion, and $10,000 in compensatory damages as well as attorney's fees.

On December 22, 1986, the district court conducted a self-styled "nonevidentiary hearing" to garner some additional information from the school principal and superintendent. In response to questioning from the court, the superintendent disclosed for the first time that he presented evidence to the school board during their closed deliberations that he had not disclosed during his testimony at the open hearing. Specifically, the superintendent told the school board during their closed deliberations that Jean Wessler, a counselor with the Clermont County Council on Alcoholism, had previously informed him that Newsome had confessed to her his involvement in the alleged possession and attempted trafficking incident. Upon learning at this hearing of this evidentiary disclosure to the school board, and prior to the dismissal of the case, Newsome's attorney approached Jean Wessler about her purported statement to the superintendent. Wessler executed an affidavit that was submitted to the district court denying that Newsome had ever confessed to her his alleged involvement in the incident and that she had ever made such a representation to the superintendent.

On December 29, 1986, the district court, 656 F.Supp. 147, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, issued an order denying Newsome's motion for a temporary restraining order and a preliminary injunction and dismissing his action on the merits. It is from this order that Newsome now appeals.

## II.

■ Remarkably, in its argument to the district court and in its brief to this court, the school district does not raise the issue of whether Newsome has article III standing to seek an injunction ordering the school district to revise its pre-expulsion procedures so that they accord with the dictates of due process. We reach this issue *sua sponte*, however, because constitutional standing is always a "threshold inquir[y] which this court is obligated to consider prior to asserting jurisdiction over [an] appeal." *Allstate Ins. Co. v. Wayne County*, 760 F.2d 689, 691 (6th Cir.1985).

In *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Supreme Court held that, where a plaintiff has been deprived of his constitutional rights by the acts of government officials and seeks declaratory relief to the effect that any such future acts of deprivation are repugnant to the Constitution and/or an injunction preventing such future acts, the plaintiff must demonstrate that he is presently exposed to "a real and immediate threat" of future deprivation by the complained of acts. *Id.* at 105, 103 S.Ct. at 1667. In order to meet this burden, the plaintiff must show that: (1) he is likely to have another encounter with government officials of the kind which precipitated the complained of act; and (2) either the government officials *always* engage in the complained of act or the government ordered or authorized the act. *Id.* at 105–06, 103 S.Ct. at 1667.

In concrete terms, *Lyons* dealt with a case in which the plaintiff had been stopped by Los Angeles police department officials for violating the traffic laws of the State of California. Allegedly without provocation, the officers administered a "chokehold" to the plaintiff causing injury to his larynx. The plaintiff brought suit in federal district court seeking not only damages but also a judicial declaration that the routine use by Los Angeles police officers of chokeholds on non-threatening detainees violates the first, fourth, eighth, and fourteenth amendments as well as an injunction prohibiting the police from using such chokeholds except in cases where the detainees threatened the officers with physical harm. After obtaining such relief below, the Supreme Court reversed, holding that the plaintiff lacked standing to seek declaratory relief or an injunction preventing the use of chokeholds because, *inter alia*, he could not demonstrate that he was likely to have another confrontation with the Los Angeles police.

The Supreme Court's holding in *Lyons* controls the instant case to the extent that Newsome seeks an injunction requiring the school district to revise its pre-expulsion procedures so that they accord with the demands of due process.[1] Newsome does not allege—and we cannot presume—that he will again be brought before the school board in another expulsion proceeding. Consequently, Newsome does not satisfy the *Lyons* standing test, and, therefore, this court lacks jurisdiction to entertain his action for an injunction requiring the school district to devise new, pre-expulsion proceedings.

### III.

Having determined that Newsome lacks article III standing to seek an injunction ordering the school board to revise its pre-expulsion procedures, we proceed with an analysis of his claims of procedural due process violations during the school board review of the superintendent's expulsion decision. We note as a general matter that, while the Supreme Court has addressed the issue of what process is due public school students in *short suspension* cases, *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 72 (1975), the Court has specifically left open the question of what process is due in long-term suspensions (suspensions exceeding ten days) and expulsion cases. In the Court's words, "We should also make it clear that we have addressed ourselves solely to the short suspension, not exceeding ten days. Longer suspensions *or expulsion for the remainder of the school term*, or permanently, *may* require more formal procedures." *Id.* at 584, 95 S.Ct. at 741 (emphasis added).

Without the aid of Supreme Court authority directly on point, we are left with resolving the procedural due process issues presented in this appeal under the more general rubric of *Matthews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18

---

1. We note, however, that *Lyons* does not implicate Newsome's prayer for an injunction requiring the school district to readmit him as a student with a clean record and no loss of academic credit and to provide him with tutorial assistance in making up the academic work he missed due to his expulsion. This prayed-for injunction is not aimed at preventing *future* constitutional violations but to repair the harm caused by *past* violations. *See Banks v. Burkich*, 788 F.2d 1161, 1163 (6th Cir.1986).

(1976). *Matthews* provides for a flexible, policy-oriented analysis of procedural due process issues in which three competing factors are balanced against each other. These factors are: (1) the private interest that will be affected by the official action; (2) the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the fiscal and administrative burden that the additional or substitute procedural requirements would entail. *Id.* at 334–35, 96 S.Ct. at 902.

In order to avoid repetition, we note at the outset that a United States citizen's interest in the free public education to which he is entitled is "important." *Goss*, 419 U.S. at 574, 95 S.Ct. at 736. Consequently, our analysis of Newsome's procedural due process claims will focus on the inquiry: "Is the probable value of the additional, pre-expulsion, procedural safeguards proposed by Newsome to protect his important interest in a free public education outweighed by the burden that would be placed upon the school district by the additional safeguards?" After careful inquiry, we conclude that Newsome was denied due process by the superintendent's disclosure to the school board of Jean Wessler's alleged statement to him when such statement had not been introduced during the open hearing, but that he was not denied due process by not being permitted to cross-examine or to know the names of his student accusers, by not being permitted to cross-examine the school principal and superintendent, and by not being permitted to be present at the school board's closed deliberations even though the school principal and superintendent were allowed to attend.

### A.

◼ Newsome first contends that he was denied due process of law at the school board hearing when the board denied his request for permission to cross-examine his student accusers or to at least know their identities. We disagree.

The value of cross-examination to the discovery of truth cannot be overemphasized. As the Supreme Court stated in *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 110, 39 L.Ed.2d 347 (1974), "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." In the instant case, allowing Newsome, through his attorney, to cross-examine his student accusers, or even merely to know their names, would have afforded Newsome the opportunity to challenge the students' credibility. For example, a prior altercation of some sort between Newsome and his accusers might have been brought to light through cross-examination or by disclosure of their identities.

The value of cross-examining student witnesses in school disciplinary cases, however, is somewhat muted by the fact that the veracity of a student account of misconduct by another student is initially assessed by a school administrator—in this case, the school principal—who has, or has available to him, a particularized knowledge of the student's trustworthiness. The school administrator generally knows firsthand (or has access to school records which disclose) the accusing student's disciplinary history, which can serve as a valuable gauge in evaluating the believability of the student's account. Additionally, the school administrator often knows, or can readily discover, whether the student witness and the accused have had an amicable relationship in the past.[2] Consequently, the process of cross-examining the student witness may often be merely duplicative of the evaluation process undertaken by the investigating school administrator.

The value of cross-examining student witnesses in pre-expulsion proceedings must be set against the burden that such a practice would place upon school administration. Today's public schools face severe

---

**2.** That such a credibility assessment was made by the principal in the instant case is evidenced by his testimony before the district court in which he stated that he did not believe that the two students were "out to get" Newsome and that the students were not close friends but mere casual acquaintances.

challenges in maintaining the order and discipline necessary for the impartation of knowledge. A recent study conducted by the Fullerton, California, Police Department and the California Department of Education, for instance, shows that, while schoolteachers in the 1940's listed talking, chewing gum, and running in the hallways as the primary disciplinary problems they encountered, today's schoolteachers are more concerned with drug abuse, rape, robbery, assault, burglary, arson, and bombings. Bowen, *Getting Tough*, TIME, Feb. 1, 1988, at 54. Indeed, in a recent Supreme Court decision involving the fourth amendment restraints on school administrators, the Court noted that "drug use and violent crime in the schools have become major social problems." *New Jersey v. T.L.O.*, 469 U.S. 325, 339, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985) (citing 1 NIE, U.S. Dept. of Health, Education and Welfare, Violent Schools—Safe Schools: The Safe School Study Report to the Congress (1978)).[3]

In this turbulent, sometimes violent, school atmosphere, it is critically important that we protect the anonymity of students who "blow the whistle" on their classmates who engage in drug trafficking and other serious offenses. Without the cloak of anonymity, students who witness criminal activity on school property will be much less likely to notify school authorities, and those who do will be faced with ostracism at best and perhaps physical reprisals. *See Graham v. Knutzen*, 351 F.Supp. 642, 666 (D.Neb.1972). *See also Jaska v. Regents of Univ. of Michigan*, 597 F.Supp. 1245, 1253 (E.D.Mich.1984); *Dillon v. Pulaski County Special School Dist.*, 468 F.Supp. 54, 58 (E.D.Ark.1978), *aff'd*, 594 F.2d 699 (8th Cir. 1979). Giving due weight to the important interest a student accused of serious misconduct has in his public education, we conclude that the necessity of protecting student witnesses from ostracism and reprisal outweighs the value to the truth-determining process of allowing the accused student to cross-examine his accusers.[4]

### B.

■ Newsome's second allegation of procedural due process deprivation by the school board concerns the board's denial of his attorney's request to cross-examine the school principal and superintendent. Newsome postulates that, had he been afforded the opportunity to cross-examine the two school administrators, flaws in their investigation of the alleged drug trafficking incident, as well as personal animus against Newsome, might well have surfaced. We do not take issue with Newsome's claim that cross-examination would have improved the fact-finding process, particularly since, in his case, cross-examination of the school superintendent during the school board hearing may well have brought out the superintendent's erroneous reliance on Jean Wessler's purported statement concerning Newsome's alleged confession.

Again, however, *Matthews* instructs us to balance the benefit that would be derived from the cross-examination of school authorities during pre-expulsion proceedings, together with the important interest that a public school student has in his education, against the burden that cross-examination would place on the school board or other decisionmaker. We hold that the burden of cross-examination on the administration of school discipline outweighs the benefits to be derived from that procedure.

School boards and administrators are charged with a variety of responsibilities critical to the effective operation of our public schools. These responsibilities in-

---

**3.** We recognize that there is no proof in the record with respect to the conditions that prevailed in Batavia High School at this time. However, if we should herein establish a rule that the requirement of cross-examination of student accusers must turn on conditions in the school, federal courts would be charged with the unwieldy task of determining in each school expulsion case whether the conditions prevalent in the school would permit cross-examination of student accusers. We believe that the wiser course is to leave the decision to the individual school administrations.

**4.** As will be seen in Part IIIB of this opinion, to require cross-examination of the student accusers would unnecessarily formalize school expulsion proceedings, imposing the additional burden on school administrators of applying, to some extent, the rules of evidence.

clude, not only meting out disciplinary punishment for student infractions of school rules, but also hiring and firing teachers and other school personnel, planning curricula, meeting the dietary and health needs of the student population, assisting in college and vocational placement, supplying and maintaining the school buildings, providing challenging and rewarding extracurricular activities, and doing all the above often within the framework of an increasingly tighter budget. School boards and administrations are not quasi-judicial in the sense that, for example, state officials who determine the continued entitlements of individuals to welfare benefits are. To saddle them with the burden of overseeing the process of cross-examination (and the innumerable objections that are raised to the form and content of cross-examination) is to require of them that which they are ill-equipped to perform. The detriment that will accrue to the educational process in general by diverting school board members' and school administrators' attention from their primary responsibilities in overseeing the educational process to learning and applying the common law rules of evidence simply outweighs the marginal benefit that will accrue to the fact-finding process by allowing cross-examination.

In *Boykins v. Fairfield Bd. of Educ.*, 492 F.2d 697 (5th Cir.), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1974), the Fifth Circuit was faced with a similar claim from expelled students that their right to due process was violated by not being allowed to cross-examine their school principal, who, during pre-expulsion hearings before the school board, provided a summary of the evidence uncovered during his investigation, including the hearsay statements of various teachers. Although the *Boykins* opinion was rendered before the Supreme Court's decisions in *Goss* and *Matthews*, the court's rejection of the students' claim is consistent with both opinions. As the Fifth Circuit stated:

> There is a seductive quality to the argument—advanced here to justify the importation of technical rules of evidence into administrative hearings conducted by laymen—that, since a free public education is a thing of great value, comparable to that of welfare sustenance or the curtailed liberty of a parolee, the safeguards applicable to these should apply to it.... In this view we stand but a step away from the application of the *strictissimi juris* due process requirements of criminal trials to high school disciplinary processes. And if to high school, why not to elementary school? It will not do.
>
> The requirements of due process are sufficiently flexible to accommodate themselves to various persons, interests and tribunals without reduction to a stereotype and hence to absurdity.... Basic fairness and integrity of the fact-finding process are the guiding stars. Important as they are, the rights at stake in a school disciplinary hearing may be fairly determined upon the "hearsay" evidence of school administrators charged with the duty of investigating the incidents. We decline to place upon a board of laymen the duty of observing and applying the common-law rules of evidence.

*Id.* at 701. We agree with this analysis.

## C.

■ Newsome's third allegation of due process deprivation during the school board hearing involves the participation of the school principal and the superintendent in the closed deliberations of the school board when Newsome and his counsel were not allowed to attend. Newsome contends that such participation by the principal, who investigated the allegations of Newsome's drug trafficking and who recommended suspension, and the superintendent, who ordered Newsome expelled from school for the remainder of the fall semester, biased the school board and deprived him of his right to an impartial decisionmaker. We disagree.

We note initially that the principal and superintendent were nonvoting participants in the board's deliberation process whose involvement was limited to participating in the board's discussion. Although we recognize that, as appears to have been the

case here, participation by the investigating administrators in the deliberation process of the fact-finders is an open invitation for the administrators to bring up evidence of the student's guilt which had not been disclosed to the student as required by *Goss*, 419 U.S. at 581, 95 S.Ct. at 739, we cannot say that, as a general matter, it is a violation of due process for investigating administrators to participate in the deliberation process.

■ In *Brewer v. Austin Indep. School Dist.*, 779 F.2d 260 (5th Cir.1985), the Fifth Circuit, in a case involving the expulsion of a high school student for possession of marijuana, pointed out that:

> A school administrator involved in the initiation and investigation of charges is not thereby disqualified from conducting a hearing on the charges, although the facts of an occasional case may demonstrate that a school official's involvement in an incident created a bias "such as to preclude his affording the student an impartial hearing."

*Id.* at 264 (citations omitted). In the instant case, then, not only was it permissible for the school principal and superintendent to participate in the school board's deliberations, it would not be a denial of due process for them to have voted with the board, or even to have held the pre-expulsion hearing themselves and reached the final, binding decision concerning Newsome's expulsion.[5] A student faced with expulsion has the right to a pre-expulsion hearing before an impartial trier-of-fact—he does not have the right to a full-blown administrative appellate process.[6]

### D.

■ Newsome last complains that he was denied procedural due process when the superintendent disclosed to the school board, during their closed deliberations, new evidence which had not been presented during the open hearing at which Newsome and his attorney were present. We agree.

As has been stated, in *Goss* the Supreme Court first addressed the issue of what process is due public school students in school *suspension* cases. While *Goss* specifically limited itself to "the short suspension, not exceeding ten days," 419 U.S. at 584, 95 S.Ct. at 741, it nevertheless establishes the *minimum* requirements for long-term expulsions as well.

The minimum requirements established for school expulsions in *Goss* are "oral and written notice of the charges against [the student] and, if he denies them, *an explanation of the evidence the authorities have* and an opportunity to present his side of the story." *Id.* at 581, 95 S.Ct. at 740 (emphasis added). In the instant case, Newsome received written notice of the charge that he had possessed marijuana with the intent to distribute, and he denied the allegation. Consequently, it was incumbent upon the school officials who possessed evidence of Newsome's alleged involvement in the marijuana incident to inform Newsome, during the school board hearing, of their evidence so that he would have an opportunity to rebut the evidence.

The superintendent failed to comply with this minimum procedural safeguard required by *Goss* during the school board hearing. Rather than disclosing to Newsome during the open hearing before the

---

5. Obviously, if Newsome had shown that the principal and/or superintendent possessed either a pre-existing animus towards him, or had developed a bias because of their involvement in the incident, they would not have been able to act as decisionmakers in Newsome's pre-expulsion hearing. Newsome, however, does not make this contention, and we find no evidence in the record to support such a contention.

6. One may wonder why we reached the issues of whether Newsome had the right to cross-examine his student accusers or the investigating authorities during the school board review of

the superintendent's decision to expel Newsome since we hold that the school district was not required to provide such pre-expulsion, appellate review in the first place. The answer is simply that Newsome was also denied the opportunity to cross-examine his student accusers and the investigating administrators during the superintendent's initial hearing on the matter. But for the school district's procedure of allowing pre-expulsion appeal to the school board, Newsome would have undoubtedly raised his claims to the right to cross-examine in the context of the superintendent's hearing.

school board that Jean Wessler, a counselor with the Clermont County Council on Alcoholism, had informed him that Newsome had confessed to her his involvement in the marijuana incident so that Newsome would have an opportunity to rebut this item of evidence, the superintendent waited until the closed deliberation session to apprise the school board of this information.[7] Such a tactic completely deprived Newsome of any opportunity to rebut the evidence and amounted to a clear deprivation of his right to procedural due process of law.[8]

### IV.

For the forgoing reasons, the judgment of the district court is REVERSED and the case REMANDED to the district court to determine whether Newsome is entitled to the injunctive and compensatory relief he seeks. To the extent that Newsome seeks money damages to compensate him for the violation of his fourteenth amendment right, he must demonstrate, on remand, that he suffered *actual* injury (such as mental and emotional distress) caused by the violation. To the extent that Newsome seeks reparative relief aimed at restoring him to the position he would have occupied but for the due process violation, he is entitled to such relief unless the *school district* can prove, by a preponderance of the evidence, that, even had it not deprived Newsome of his right to procedural due process, he would have still rightfully been expelled. *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

---

**7.** This case presents a classic illustration of why procedural due process, at a minimum, requires notice of both the charges and the evidence against an individual since Newsome was able, during the district court proceedings, to secure an affidavit from Jean Wessler denying that Newsome had ever confessed to her his alleged involvement in the incident and that she had ever represented to the superintendent that Newsome had confessed to her.

**8.** The school district asserts that we are without jurisdiction to decide the issue of whether the superintendent's disclosure to the school board of Wessler's alleged statement to him when such disclosure had not been made during the open hearing violated Newsome's right to procedural due process since Newsome did not specifically raise this issue before the district court. The answer to this contention is, however, that Newsome's failure to raise this issue was the product of the superintendent's nondisclosure of his actions until he testified at the district court hearing.