**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 14a0125n.06

Case No. 13-1791

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| C.Y., a minor, by her next friend, Terri Antone, | ) | **FILED**<br>Feb 11, 2014<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| LAKEVIEW PUBLIC SCHOOLS, et al., | ) | MICHIGAN |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

**BEFORE: SUTTON, McKEAGUE, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** In 2012, high-school freshman C.Y. was suspended, and subsequently expelled, for bringing a knife to school and threatening to stab a student with it. C.Y.'s mother, Terri Antone, filed suit on C.Y.'s behalf against the Lakeview Public School District, members of the Board of Education, and school administrators (collectively, Defendants), alleging that C.Y. was denied due process at her suspension and expulsion in violation of the Fourteenth Amendment. The district court granted summary judgment for Defendants, and Antone ("Plaintiff") appeals. We AFFIRM.

**FACTS**

During the 2011-2012 school year, C.Y. was a freshman at Lakeview High School. At some point during the year, she had a falling out with another student, A.B. The incidents giving rise to C.Y.'s suspension and expulsion took place on February 21, 2012.

**1.     February 21, 2012**

At 6:30 a.m., C.Y. tweeted "stab stab stab. Going to stab stab stab you today to see your insides, ya ya ya." At around 12:30 p.m., A.B. and a school counselor reported to Assistant Vice-Principal Heather Huber that C.Y. had brought a knife to school and was threatening to stab A.B. Huber sought out C.Y., but was informed by the attendance office that she had checked out of school and been picked up by her brother. Huber questioned other students who might be able to confirm A.B.'s report. J.Y., a friend of C.Y.'s, confirmed that at 10:00 a.m. that morning, C.Y. had told J.Y. that she planned to stab A.B., and had shown J.Y. a steak knife tucked into the back of her binder. J.Y. prepared a witness statement to that effect. While J.Y. was writing the statement, C.Y. sent her texts, which J.Y. showed to Huber:

12:46: Who told AB about the knife

12:53: Someone did. Hmmm, they're gonna think she's a nut case when she tells me. Lol she doesn't have proof I brang [sic] a knife

1:09:   I wasn't gonna actually stab her

After speaking with J.Y., Huber met with A.B. again. A.B. showed Huber C.Y.'s 6:30 a.m. tweet, and told Huber that C.Y. had been bullying her. A.B. reported that a few days prior, C.Y. had posted on Facebook a picture of a T-shirt that she made, with a photograph on it of A.B.'s mother in a coma after a suicide attempt and a caption stating "DEAD BITCH." Huber then spoke with and obtained written statements from two other students who said they heard C.Y. threaten to stab A.B. And, finally, Huber called C.Y.'s mother. It is unclear whether the call occurred during the school day or after it ended. Antone says that Huber suspended C.Y. during the call, but Huber says she called to tell Antone about the statements and to schedule a meeting, and did not suspend C.Y. until the next day.

**2.    February 22, 2012 meeting**

The meeting took place first thing the next morning. Huber, C.Y., Antone, and C.Y.'s brother Christopher were present. According to Antone, Huber said that "several students had told her" that C.Y. brought a knife to school and that C.Y. had shown the knife to other students, but Huber did not show C.Y. the statements, tell her how many she had collected, or identify the student witnesses. Antone states that after explaining the charges, "Huber listened to C.Y., Christopher and myself on the issue for a brief while, but . . . made it perfectly clear that we had no chance to get C.Y. back into school before the school board ruled on her expulsion." Huber asked C.Y. to prepare a written statement capturing her side of the story. In her statement, C.Y. admitted to the tweet, and admitted that she threatened A.B. during conversations with two students, but she denied bringing a knife to school. She wrote:

> At 6:30 in the morning I tweeted threatening no one that I was going to stab them knowing that [A.B.] would see it. I was hoping it'd scare her off because the night before [A.B.] and [another student] were calling me non[-]stop and they were threatening to jump me and I told [J.] and [J.] that knowing they'd tell [A.B.]. I did not bring a knife to school. But, I said I did because I thought maybe other kids would find out and think I'm crazy, so everyone would leave me alone. Then in 3rd hour I was nervous and getting scared that I'd get jumped and I was puking. Then on my way to my locker [J.E.] pushed me. Then when I got home I texted [J.Y.] telling her that I wasn't really going to stab [A.B.] because I wasn't going to. My intentions were to scare her. A person can only take so much of someone until they snap and do something stupid.

Huber says she determined C.Y. should be suspended at that meeting.

The next day Huber sent Antone a letter memorializing the decision, and advising her that C.Y. might be expelled. She included with the letter the school district policies regarding weapon possession on school property. Principal Brent Case sent a similar letter the following day, stating that C.Y. was suspended for possession of a weapon, quoting the applicable portion of the school district student handbook, and advising C.Y.'s mother that state and federal law

3

required him to recommend an expulsion hearing for any student possessing a knife with a blade over three inches.[1]  Both letters advised Antone that the superintendent would be contacting her to schedule the next hearing.  Around this time, Huber prepared a one-page summary of her investigation, describing the events and conversations discussed above.

### 3.     March 1, 2012 Pre-Expulsion Hearing

On March 1, 2012, Superintendent Karl Paulson conducted a pre-expulsion hearing. C.Y., her mother, brother, and Huber attended.  Paulson began the hearing by explaining the allegations against C.Y., her potential punishment, and the hearing procedures.  Huber and Paulson state that C.Y. was shown all of the evidence against her, including the witness statements, and was allowed to question Huber about it.  Antone denies that C.Y. was ever allowed to review the witness statements and report, and says that at the March 1 hearing, Huber merely "repeated the same allegations from our former meeting with her, offering no new information."  C.Y had the opportunity to address Paulson, and Paulson asked questions of both sides.  At the close of the hearing, Paulson said he would be recommending an expulsion hearing.

Paulson sent C.Y.'s mother a letter the next day, confirming his recommendation, and informing her that the expulsion hearing would take place on Tuesday, March 6, 2012, at 7:30 p.m.  The letter stated that C.Y.'s "charged violations of the Code of Conduct included bringing a knife to school and stating to several students that she intended to stab another student with it." Paulson enclosed with the letter a copy of the Code of Conduct and Board Bylaws that C.Y. was

---

[1]Huber's letter and Case's letter each provide different start dates for the suspension.  Huber's states that C.Y. was suspended for ten days, from February 21, 2012, through March 6, 2012. That range of dates is actually eleven school days, inclusive.  Case's letter, consistent with Defendants' position in litigation, states that C.Y. was suspended for ten days, starting February 22, 2012.

accused of violating.[2] Antone requested in writing that the hearing be in closed session.[3] The day before the hearing, Paulson received a letter from C.Y.'s psychologist, Dr. William Irving, written on her behalf. C.Y. also hand-delivered to Paulson a handwritten statement from a student with the initials J.S., stating that two other students, and not C.Y., had made the T-shirt with the picture of A.B's mother on it.

### 4.    March 6, 2012 Expulsion Hearing

C.Y. attended the closed session with her parents. Huber, Case, and Paulson appeared on the school's behalf, and all seven members of the Board were present. The Board explained the charges against C.Y. Huber presented the evidence in support of expulsion, including Huber's report, all of the witness statements and C.Y.'s statement. C.Y. answered questions from the Board, submitted the written statement from Dr. Irving, and her father read aloud a statement prepared by C.Y.'s brother Christopher. C.Y. and her mother claim that Paulson had advised them that Christopher would be allowed to attend the hearing, but the Board refused to let Christopher attend or read his statement. C.Y.'s father read the statement instead, but he does

---

[2]Defendants state that the materials shared with the Board to support the request for expulsion—presumably the witness statements and report—were enclosed with the letter, citing the letter itself as evidence for the contention. But the letter contradicts the assertion. Although the enclosures line lists "materials sent to the Board of Education" as enclosed along with the bylaws and Code of Conduct, the body of the letter states that the "materials that will be shared with the Board of Education regarding [C.Y.]" were available to be picked up at the school, and that if not picked up they would be mailed at the end of the day on March 2, 2012. Nothing in the record indicates that they were mailed at the end of that day or picked up.

[3]Plaintiff states, and Antone avers, that in his letter, Paulson denied the request for a closed hearing. They may have misunderstood Paulson's statements. He wrote "[y]ou have requested, in writing, that the hearing be held in closed session, but any action taken by the Board of Education must be held in open session." Consistent with this statement, the Board's meeting minutes show that the Board held the *hearing* in closed session, as Antone requested, but voted on the expulsion, *i.e.* took "action," in open session, as Paulson stated they were required to do. In any event, whether Paulson denied the request in the letter is immaterial because the Board voted on and granted the request at the March 6 meeting.

not read very well and, according to Antone, "stammered and was obviously extremely nervous and uncomfortable" as he read. At the close of the hearing, the Board voted unanimously to expel C.Y.

Two days after the hearing, Paulson sent C.Y. a letter confirming her expulsion and listing three alternative education programs for students with disciplinary records where C.Y. could apply for immediate enrollment. C.Y. applied to at least one of the schools and was rejected. She enrolled at Roseville Community Schools, in her home district, in October 2012.[4]

## ANALYSIS

This court reviews the decision to grant a motion for summary judgment de novo. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). Summary judgment is appropriate where, drawing all reasonable inferences in favor of the nonmovant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Williams*, 186 F.3d at 689.

Under the Fourteenth Amendment, a state may not "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV. Due process has both a substantive and a procedural component. Plaintiff contends that C.Y.'s *procedural* due process rights were violated. The fundamental requirements of procedural due process are notice and an opportunity to be heard. *See Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000) (procedural due process is "often summarized as 'notice and an opportunity to be heard'"). But, the determination of what kind of notice and what kind of hearing due process requires depends on the context. *See Goss v. Lopez*, 419 U.S. 565, 577 ("'[T]he very nature of due process negates

---

[4]Lakeview High School was not in C.Y.'s school district. She enrolled through the district's School of Choice program, which allows students to petition to attend a school outside their home district.

any concept of inflexible procedures universally applicable to every imaginable situation.'")
(quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)); *see also Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 924 (6th Cir. 1988) (applying, in a school-expulsion case, the "flexible, policy-oriented analysis of procedural due-process issues" presented in *Mathews v. Eldridge*, 424 U.S. 319 (1976)).

1.      **C.Y's Suspension**

The Supreme Court's decision in *Goss v. Lopez*, 419 U.S. 565 (1975), sets forth the minimum due-process requirements applicable to school suspensions of ten days or less. *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011) (describing *Goss* as the "starting point for analyzing alleged violations of students' procedural due process rights in school suspension cases"). The student must "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss*, 419 U.S. at 581. The notice need not be formal, and there "need be no delay between the time 'notice' is given and the time of the hearing." *Id.* at 582. That is, minimum due-process requirements are met if, during "an informal give-and-take between student and disciplinarian," the student is "told what he is accused of doing and what the basis of the accusation is" and then given an opportunity to respond. *Id.* at 584, 582; *see also Buchanan v. City of Bolivar*, 99 F.3d 1352, 1359 (6th Cir. 1996) ("[O]nce school administrators tell a student what they heard or saw, ask why they heard or saw it, and allow a brief response, a student has received all the process that the Fourteenth Amendment demands.") (quoting *C.B. v. Driscoll*, 82 F.3d 383, 386 (11th Cir. 1996)). *Goss* did not address the due-process requirements for suspensions longer than ten days, noting only that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id.* at 584.

7

Plaintiff contends that the fact issue regarding *when* C.Y. was suspended—whether her suspension began on February 21st or 22nd—prevents summary judgment for Defendants on her suspension-related due-process claim. If Huber suspended C.Y. during the telephone call with C.Y.'s mother on the 21st, Plaintiff argues, then C.Y. was suspended without being informed of the allegations against her and given an opportunity to respond, in violation of *Goss*; and she was suspended for longer than ten days, requiring more extensive procedures than discussed in *Goss*. We disagree.

First, assuming Plaintiff's version of the facts, it would not have violated due process for Huber to suspend C.Y. over the phone on the 21st. Huber had received reports that C.Y. intended to stab A.B. in a fight after school that day. She sought out C.Y. immediately, but C.Y. had already left school grounds. Under the circumstances, it would have been reasonable for Huber to direct C.Y. not to return to school until Huber had the opportunity to meet with her. *See Goss*, 419 U.S. at 582–83 ("Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable."). Huber scheduled her meeting with C.Y. for first thing the next morning, and during the meeting, C.Y. was told the allegations against her and given a chance to respond to them, satisfying *Goss*'s requirements.

That C.Y.'s suspension may have exceeded ten days does not change this analysis. It is undisputed that C.Y. attended school on the 21st through third period, and then left voluntarily. Nothing in the record suggests that she intended to or attempted to return that day. Attendance records show that her absence during fourth period was excused, and that she was not marked suspended until the next day. Accordingly, the record shows that C.Y. was suspended at most

8

for ten days plus one or two class periods, that she missed those class periods voluntarily, and that her status as suspended was not recorded until the 22nd. Under these circumstances, the additional deprivation posed by the two extra class periods of suspension is not significant enough to require a deviation from the standards set forth in *Goss*.

## 2.    C.Y.'s Expulsion

This court addressed the procedural safeguards required when a student is expelled in *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920 (6th Cir. 1988). Applying the three-factor inquiry in *Mathews v. Eldridge*, 424 U.S. 319 (1976), the court held that students facing expulsion have the right to a hearing before an impartial trier of fact, but do "not have the right to a full-blown administrative appellate process." *Newsome*, 842 F.2d at 927. Students do have a right to have the evidence against them explained and to be given an opportunity to rebut that evidence, but this right does not entitle them to know the identity of student witnesses, or to cross-examine students or school administrators. *Id.* at 924–27. Moreover, absent a showing of bias, it does not violate due process for school administrators to communicate ex parte with the Board, or even to participate in the Board's deliberation process. *Id.* at 927.

C.Y. was afforded adequate process. It is undisputed that she received notice of the charges against her on several occasions. Huber explained the allegations—that C.Y. brought a knife to school and threatened another student with it—on the phone to Antone on February 21, 2012, and again at the meeting on the morning of the 22nd. Huber and Case reiterated the charges in their letters on the 23rd and 24th, and the charges were explained again at the March 1, 2012 pre-expulsion hearing, in Paulson's March 2, 2012 follow-up letter, and at the expulsion hearing itself. It is also not disputed that C.Y. was provided an opportunity to explain her side of

9

things no less than three times, either directly or in response to questions: at the meeting with Huber, and during the hearings before Paulson and the Board.

Plaintiff argues, however, that C.Y. was denied several important additional procedural safeguards. First, citing *Newsome*, she argues that C.Y. was not apprised of the evidence against her because, according to C.Y. and Antone, C.Y. was never allowed to read the witness statements or Huber's report. In *Newsome*, a high-school student was expelled for allegedly attempting to sell marijuana on school grounds. This court found a violation of the student's procedural due process rights because during the Board's closed deliberations the superintendent disclosed evidence that the student had confessed to a counselor, but that evidence had never been provided to the student and was not mentioned during the open hearing attended by the student and his attorneys. "Such a tactic," this court found, "completely deprived Newsome of any opportunity to rebut the evidence and amounted to a clear deprivation of his right to procedural due process of law." *Id.* at 928.

*Newsome* is distinguishable, however, because the substance of the evidence—that the student had allegedly confessed—was never revealed to the student; but here, undisputed evidence shows that the substance of the witness statements and the report were conveyed to C.Y. and her mother repeatedly, and no essential facts were withheld. *See Paredes by Koppenhoefer v. Curtis*, 864 F.2d 426, 430 (6th Cir. 1988) (suspended student's inability to review statement of anonymous witness did not violate due process where, inter alia, "the essential facts concerning Doe's allegations were laid in front of Paredes through the testimony of [the superintendent]"). Huber's report contained nothing that was not included in the student statements, other than the chronology of Huber's investigation. The gravamen of the student statements was that C.Y. had brought a knife to school, shown the knife to one student, and

stated more than once that she intended to stab A.B. after school. C.Y. was informed multiple times that students had made those allegations. Specifically, according to Antone, Huber informed the family at the meeting on the 22nd that "several students" had told her that C.Y. had brought a knife, that they had seen the knife, and that C.Y. threatened A.B. C.Y's statement, written at that meeting, acknowledges as much: she admitted the tweet, and she referred to telling two students that she was going to stab A.B. Moreover, Huber and Paulson also referred to the witnesses' allegations in their letters to Antone. Accordingly, whether or not C.Y. was provided copies of the statements and report, the record leaves no doubt that she received an explanation of their contents adequate to prepare her defense, and thus her due process rights were not infringed. *See Newsome*, 842 F.2d at 927 (student has a right to "an *explanation* of the evidence the authorities have") (emphasis added) (quoting *Goss*, 419 U.S. at 581).

Second, Plaintiff contends that C.Y. was denied the right to call witnesses on her own behalf when Defendants refused to let her brother appear and testify at the hearing. Defendants dispute the basis of the claim, contending that the record does not contain any evidence that Christopher intended to *testify* at the hearing, only that he intended to read a prepared statement. It *is* true that the references in the record to Christopher's attendance at the hearing primarily describe only his intention to read a statement, and never explicitly refer to any intention to otherwise "testify." But Plaintiff points to the italicized language in the following excerpt from Antone's affidavit as evidence that Christopher planned to make statements in addition to his prepared statement:

> C.Y., Christopher, my ex-husband and I all went to the expulsion hearing on March 6, 2012. Almost immediately, though, we were told that Christopher could not attend the meeting because of our earlier request that the meeting be held in private. We told the school board that Christopher had written out a statement and that *he was best prepared to explain C.Y.'s version of what had happened*.

11

> We begged them to let Christopher speak, but they said that he could not speak at the meeting or even be present in the room with us.

It is arguably a fair inference from this statement that the family expected Christopher to attend the hearing and believed that if he attended, he would be able to speak and make comments in addition to reading his prepared statement. But even drawing that inference, we find no due process violation.

An accused student's right to respond to charges against her "will generally include the opportunity to make a statement and present evidence and . . . may also include the right to call exculpatory witnesses." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005). Absent authoritative precedent regarding what due process requires in *this* context, this court balances (1) C.Y.'s important interest in her education, (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of the requested procedural safeguard, and (3) the government's interest, including the fiscal and administrative burden that the additional procedural safeguard would entail. *See Newsome*, 842 F.2d at 924 ("Without the aid of Supreme Court authority directly on point, we are left with resolving the procedural due process issues presented in this appeal under the more general rubric of *Mathews v. Eldridge*, 424 U.S. 319."); *see also Mathews*, 424 U.S. at 334–35.

Here, we find nothing in the record to suggest that preventing Christopher from making comments in addition to his written statement increased the risk of an erroneous deprivation of C.Y.'s rights. It is undisputed that Christopher's written statement was read to the Board in full. The statement is not in the record, and neither is any affidavit from Christopher. C.Y. and Antone's affidavits similarly do not describe the content of Christopher's statement and, more importantly, they do not identify any information that Christopher's absence prevented C.Y. from presenting to the Board. Plaintiff suggests that Christopher might have said what Antone

claims he told her on the 21st—that he did not see C.Y. with a knife when he picked her up from school. But the observation is not particularly exculpatory, especially in light of J.Y's statement that the knife was in the back of C.Y.'s binder, and moreover, nothing prevented Antone from telling the Board about it herself. On these facts, denying C.Y. the additional safeguard of allowing Christopher to be present at her expulsion hearing and make unspecified comments in addition to his written statement did not violate procedural due process.

Plaintiff also argues that C.Y. was denied the right to an impartial tribunal because the school administrators had communicated with the Board and convinced the Board of her guilt prior to the hearing. But, as noted, in *Newsome* this court held that, absent some showing of bias, it does not violate due process for school administrators to communicate ex parte with the Board, or even to participate in the Board's deliberations. *Id.* at 927 ("[I]t would not be a denial of due process for [the school principal and Superintendent] to have voted with the board, or even to have held the pre-expulsion hearing themselves and reached the final, binding decision concerning [the student's] expulsion."). Plaintiff does not allege that the Board was biased; only that Paulson's and Huber's communications had convinced it of C.Y.'s guilt before the hearing started. Due process is not implicated in those circumstances.

Plaintiff also argues that C.Y. was denied the right to appeal the Board's decision. But, "[c]ourts have consistently held that there is no right to an appeal from an academic disciplinary hearing that satisfies due process." *Flaim,* 418 F.3d at 642. Plaintiff provides no reason to depart from this precedent.

Finally, Plaintiff argues that C.Y. was not told that she had the right to an attorney. Students do not necessarily have a due-process right to an attorney at expulsion hearings, let alone a right to be *notified* that they are entitled to an attorney. *See id.* at 636. Moreover, the

district court, addressing this claim, noted that Plaintiff had not disputed Defendants' statement at oral argument that the student handbook supplied to C.Y. advised that students may be represented by counsel at expulsion hearings.  We find no due process violation.

## CONCLUSION

For the foregoing reasons, we AFFIRM.