Richard **COPLIN, as Guardian Ad Litem for Kevin Coplin, Plaintiff,**

v.

**CONEJO VALLEY UNIFIED SCHOOL DISTRICT, et al., Defendants.**

**No. CV 94–2896–ER(JRx).**

United States District Court, C.D. California.

Oct. 12, 1995.

Richard Hamlish, Law Offices of Richard Hamlish, Westlake Village, CA, for plaintiff.

Carol A. Woo, Lawler, Bonham & Walsh, Oxnard, CA, for defendants.

1. Coplin's father, Richard Coplin, is acting as Guardian Ad Litem for Kevin Coplin.

2. The Court previously issued a tentative ruling and ordered further briefing from the parties.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

RAFEEDIE, District Judge.

*Introduction*

Plaintiff Kevin Coplin[1] was suspended from high school for allegedly engaging in sexual harassment of a number of female students. During the suspension, school officials began expulsion proceedings. Coplin's parents met with the officials and then signed a form, waiving their right to a formal hearing and consenting to their son's expulsion as specified on the form. Coplin was expelled, but the expulsion was suspended and he was allowed to finish at school under probation.

Coplin has filed suit, claiming that school officials violated his right to procedural due process in undertaking these disciplinary actions. Specifically, he claims he was not given the identities of his accusers, he was not told that he had the right to remain silent and the right to counsel, and his parents were coerced into waiving his right to a hearing.

Each of the three defendants has moved for summary judgment. The Court has considered the papers filed in support of and in opposition to the motion, and the oral arguments of counsel, and HEREBY GRANTS the motion in its entirety.[2]

*Background Facts*

In May, 1993, Coplin was in his junior year at Newbury Park High School. He claims in this lawsuit that he was suspended from school and then expelled without receiving sufficient procedural due process in violation of the Fourteenth Amendment. He has filed suit under 42 U.S.C. § 1983.

The defendants in the case are Richard Simpson, Assistant Superintendent for the Conejo Valley Unified School District; Charles Eklund, Principal at Newbury Park High School; and Mildred Andress, Assistant Principal at Newbury Park High School. The defendants are being sued in their individual capacities.[3]

This opinion and order constitutes the final disposition of the matter.

3. The Court previously dismissed claims against the defendants in their official capacities and against the Conejo Valley Unified School District

Andress had received complaints from a number of female members of the school band, claiming that they had been sexually harassed by Coplin and others. In response, Andress began interviewing other female band members. After she had spoken with ten students, she believed that there was a problem, and she interviewed all the female band members, plus including some who had quit the band. (Declaration of Mildred Andress, paragraphs 4–10, 12).

On May 4, 1993, Andress and Eklund called Coplin into Andress' office and confronted him with accusations of sexual harassment. The officials showed him about forty statements by female students. These statements did not contain the names of the accusers. Instead, each was identified by a number, because the female students refused to provide statements unless they could remain anonymous. The students were concerned about potential retaliation. (Andress declaration, paragraph 11).

About half of these statements accused Coplin of sexual harassment and other forms of rude, obnoxious, and inappropriate behavior. As a representative sampling, female students claimed that Coplin: (1) groped their breasts, buttocks, and vaginal areas; (2) commented on breast sizes and called them names such "Big Titty Woman," "Big Titty," "boobies," "cunt," "sluts," and "bitches"; (3) exposed his penis to them in public; (4) "sandwiched" them.[4] (Andress declaration, exhibit B); and (5) put food down their shirts. (Andress declaration, exhibit A, p. 2) (letter of Band Director Al Zeller).

Coplin was allowed to respond to the accusations. He wrote a statement in which he admitted that he had acted inappropriately at times, although he did not admit explicitly that he had engaged in sexual harassment. School officials suspended Coplin that afternoon for five days. This discipline constituted Coplin's initial suspension.

Simpson then extended Coplin's suspension to May 23, 1993, pending a hearing to determine whether Coplin should be expelled. In a meeting on May 12, 1993, Simpson allegedly gave Coplin's parents two choices: sign a Voluntary Consent to Discipline form, which also waived the right to a hearing; or face a closed door hearing before the school board where Coplin would not be able to call any witnesses.[5] (Declaration of Richard Coplin, paragraph 11).

After consulting with his attorney, Richard Hamlish, Coplin's father signed the Consent Form on May 17, 1993, and waived Coplin's right to a hearing. On May 27, 1993, the School Board, after considering the Consent Form and Simpson's report, voted to expel Coplin. (Declaration of Richard Simpson, exhibit F).

Coplin finished that semester in the district's Independent Study Program. Pursuant to the Consent Form, however, the school suspended the expulsion for the fall semester of his senior year, from September 8, 1993 through January 31, 1994, and agreed to review the expulsion decision at that time. Coplin graduated in February, 1994, one semester early, and attended graduation with his classmates.

Thus, Coplin was actually denied education at Newbury Park High School from only May 4, 1993, to the end of that semester in late May or early June. For the fall semester, he was effectively placed on probation.

on the grounds that the Eleventh Amendment barred suit. Under California law, a school district is considered a state agency and is therefore entitled to the protection of the Eleventh Amendment, as are school officials in their official capacities. *Belanger v. Madera Unified School Dist.*, 963 F.2d 248 (9th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 1280, 122 L.Ed.2d 674 (1993).

4. "Sandwiching" is not a clearly defined term. According to Coplin, it involves two people getting together to give a hug around a third person in the middle. (Deposition of Kevin Coplin, p.

23:8–9). However, at least one victim of sandwiching stated that while she was being sandwiched, Coplin "started feeling [her] up." (Andress declaration, exhibit B, p. 13) (statement of student # 18); *see also id.* at p. 16 (statement of student # 21) ("Sometimes a few of them will gang up on you and 'sandwich' you and try to touch you.").

5. Simpson denies having given such a choice. For the purposes of this motion, however, the Court has taken Coplin's version of the facts as true.

### Standard of Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

The initial burden of establishing that there is no genuine issue of material fact lies with the moving party. Thereafter, Rule 56 requires the opposing party to "set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 [106 S.Ct. 2505, 2511] 91 L.Ed.2d 202 (1986). In addition, summary judgment must be granted unless "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.*

When a motion for summary judgment is made and supported with evidence as provided for in Rule 56, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing there is a genuine issue for trial."

▮ The opposing party must, therefore, make an affirmative showing on all matters placed in issue by the motion. These facts on which the opponent relies must be admissible at trial and made on personal knowledge. Fed.R.Civ.P. 56(e).

### Analysis

Coplin's complaint claims only one cause of action, deprivation of civil rights under color of law in violation of 42 U.S.C. § 1983.[6] Specifically, Coplin claims that his right to procedural due process was violated when Andress and Eklund suspended him without affording him sufficient procedural safeguards and when Simpson allegedly coerced his parents into waiving his right to a hearing.

▮ The constitutional right to procedural due process, guaranteed by the Fourteenth Amendment, is triggered whenever a state agency seeks to deprive a person of protected interests. *Goss v. Lopez*, 419 U.S. 565, 572 [95 S.Ct. 729] 735, 42 L.Ed.2d 725 (1975). If a state voluntarily provides public education, it cannot deprive a person of the education without providing sufficient procedural due process. *Id.* at 572–73, 95 S.Ct. at 735–36.

### I. Simpson's Motion for Summary Judgment

Coplin alleges that Simpson refused to identify his accusers prior to the expulsion hearing and misrepresented the procedures that would be in place at the hearing, thereby inducing Coplin's parents to sign a Voluntary Consent to Discipline Form. The Court will address each contention in turn.

### A. Identities of Accusers

▮ At the time of his initial suspension on May 4, 1993, Coplin had no right to know the identities of his accusers. *Goss*, 419 U.S. at 583, 95 S.Ct. at 740. *Goss*, however, did not address suspensions longer than ten days, and thus is inapplicable to the extension of Coplin's suspension pending review of expulsion proceedings. When the school officials extended Coplin's suspension beyond the original five-day period, this right, if it exists, would have arisen. The Court must therefore determine whether Coplin was entitled to know the identities of his accusers.

The Ninth Circuit has not determined whether students have a due process right to be informed of the identities of their accusers during the time period after a short-term suspension but prior to a formal hearing. Coplin relies on *Gonzales v. McEuen*, 435 F.Supp. 460 (C.D.Cal.1977), and *Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir.), *cert. denied*, 368 U.S. 930, 82

---

6. 42 U.S.C. § 1983 states in relevant part:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory of the District of Columbia, subjects, or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

S.Ct. 368, 7 L.Ed.2d 193 (1961), to support his claim.[7] However, neither case is on point.

In *Gonzales*, the district court rejected the use of hearsay statements in a school discipline proceeding on the grounds "that the accused student [was] deprived of his constitutional right to confront and cross-examine his accuser." *Id.* at 469. The district court recognized that the rules of evidence did not apply strictly at such proceedings; however, it ruled that due process prohibited the use of unsworn testimony by witnesses not subject to cross-examination. *Id. Gonzales* thus focuses on the requirements of a hearing, and not the time preceding the hearing. It is therefore inapplicable to this case.

In *Dixon*, three African–American students were expelled from a public college for taking part in a "sit in" at a segregated restaurant. The students, however, received no notice and no hearing prior to expulsion. *Id.* at 152–54. The Fifth Circuit held that, while the right to cross-examination was not necessarily required, "[i]n the instant case, the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies." *Id.* at 159. That situation is again factually distinct from this case. Here, Coplin received notice of the charges against him.

The Court notes that the recent trend of law has leaned against the requirement that students facing suspensions be given the identities of accusers. *Newsome v. Batavia Local School District*, 842 F.2d 920, 924–25 (6th Cir.1988); *Brewer v. Austin Independent School District*, 779 F.2d 260, 263 (5th Cir.1985).

*Newsome* applied the U.S. Supreme Court's test in *Mathews v. Eldridge*, 424 U.S. 319 [96 S.Ct. 893] 47 L.Ed.2d 18 (1976), to determine what level of procedural due process is required in a given situation. *Eldridge* listed three relevant factors to such a determination: (1) "the private interest that will be affected by the official action"; (2) "the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335, 96 S.Ct. at 903. The application of this test was meant to be flexible and applied on a case-by-case basis. *Id.* at 334, 96 S.Ct. at 902 (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 [92 S.Ct. 2593] 2600, 33 L.Ed.2d 484 (1972)).

The Court finds *Newsome* and *Brewer* to be persuasive and to resolve the issue squarely for this case. Nevertheless, the Court will apply the *Eldridge* factors independently.

The first factor, the private interest to be affected, favors Coplin, as Coplin has an interest in continuing to receive a public education in a formal setting.[8] However, since Coplin's education continued, first briefly under the Independent Study program, and then at Newbury Park under probation, his interest is less than that of the accused students in *Newsome* and *Brewer*.

The second factor, the risk of erroneous deprivation, favors the school officials in this case. In *Newsome*, there were only two accusers; and in *Brewer*, only three. In contrast, in this case, over twenty students had accused Coplin of a variety of forms of sexual harassment. The sheer number of students and types of complaints makes it extremely unlikely that any deprivation of

---

7. The Court notes that Coplin failed to cite *Dixon* in his Supplemental Papers. Coplin's counsel claimed that he received less than 48 hours in which to respond to the Court's Order. The Court's briefing schedule fell across the Labor Day holiday and gave each side four business days in which to file papers. Nevertheless, the

Court will address Coplin's argument based on *Dixon*.

8. The record is incomplete as to whether, during the time of his suspension, Coplin was not allowed on to Newbury Park High School only or any public high school within the school district. The Court has proceeded under the latter inter-

Coplin's interest occurred erroneously.[9] Even the case Coplin cites, *Gonzales v. McEuen,* 435 F.Supp. 460 (C.D.Cal.1977), does not support him—in *Gonzales,* the court specifically noted that the accuser had a motive to fabricate evidence against the student facing suspension. *Id.* at 469.

Coplin suggests, however, that Andress biased the accusers by asking them to write about any sexual harassment they may have suffered by Coplin. However, the students were free to respond, as many did, that they had not suffered sexual harassment by Coplin. Moreover, the variety of complaints belies the notion that Andress planted ideas in the minds of the students through her directing their attention to sexual harassment by Coplin.

Finally, the third factor, the school's interest, weighs in favor of the school. This factor is particularly strong in this case, where there are allegations of sexual harassment. *See Clyde K. v. Puyallup School District,* 35 F.3d 1396, 1401–02 (9th Cir.1994) (citing Monica L. Sherer, Comment, *No Longer Just Child's Play: School Liability Under Title IX for Peer Sexual Harassment,* 141 U.Pa.L.Rev. 2119, 2133–35 (1993) (documenting the embarrassment, fear, anxiety, and loss of self-confidence that victims of sexual harassment experience)). The victims have an interest in not being identified and subjected to reexperiencing the harassment. Moreover, were the school to be forced to identify the accusers, students might be loathe to come forward next time. This factor is particularly strong in this case, where female students refused to write statements unless given anonymity. (Andress declaration, paragraph 11).

In balancing these factors, the Court need not reach the issue of whether Coplin had a due process right to know the identities of his accusers at the hearing, since Coplin's parents waived the right to the hearing. The Court merely finds that, during the time after the initial suspension, but prior to the time when Coplin's parents waived the hearing, Coplin did not have a due process right to know the identities of his accusers.[10] Indeed, the record does not disclose that they were sought. Therefore, summary judgment is appropriately granted in favor of Simpson on this issue.

### B. The School District Hearing

Coplin next argues that Simpson violated his right to due process by coercing his parents into signing a Voluntary Consent to Discipline Form. Although stated somewhat obliquely, the basis of this claim appears to be that Simpson allegedly said Coplin would not be allowed to call witnesses on his own behalf and would not be allowed to cross-examine the school's witnesses.

Coplin's claim essentially anticipates that the school board would have violated his civil rights. That is to say, Coplin alleges that Simpson told his parents that the school board was going to violate Coplin's civil rights, and because he believed Simpson, he decided to forego his right to a hearing.

The Court will first analyze whether Coplin waived his right to a hearing. Then it will address his claim of coercion. Finally, it will address his claim that attending the hearing would have been futile.

#### 1. Waiver

■ A person may waive a constitutional right if it can be established by clear and convincing evidence that the waiver is volun-

---

pretation, as it has interpreted the facts in light most favorable to the nonmoving party.

**9.** It is important to note that the Court is not concluding that Coplin actually engaged in sexual harassment based on these accusations. The statements by the female students would be inadmissible hearsay for that purpose. Fed.R.Evid. 801, 802. In this case, however, the Court is considering instead whether the number of complaints made the risk of erroneous deprivation unlikely. Thus, the accusations are not being considered for the truth of the matter asserted,

and are therefore nonhearsay, pursuant to Fed. R.Evid. 801(c).

**10.** Coplin several times analogized the situation he faced to a criminal proceeding. However, even in the criminal proceeding, defendants have no constitutional right to discover the prosecution's witness list prior to trial. *Weatherford v. Bursey,* 429 U.S. 545, 559 [97 S.Ct. 837] 845, 51 L.Ed.2d 30 (1977); *United States v. Moore,* 936 F.2d 1508, 1515 (7th Cir.), *cert. denied,* 502 U.S. 991, 112 S.Ct. 607, 116 L.Ed.2d 630 (1991).

tary, knowing, and intelligent. *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185, 187 [92 S.Ct. 775] 782, 783, 31 L.Ed.2d 124 (1972); *Davies v. Grossmont Union High School District*, 930 F.2d 1390, 1394 (9th Cir.), *cert. denied*, 501 U.S. 1252, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991).

In *Davies*, the Ninth Circuit reviewed a settlement agreement in which the appellant, Davies, gave up his right to run for an office on the local school board. Applying the knowing and intelligent standard, the court found that Davies had in fact waived his constitutional right to run for office.[11] *Id.* at 1394. Davies was represented by counsel during settlement negotiations, the agreement that he signed stated that he had been advised of the consequences and knowingly entered into it, and finally, as a highly educated person, he must have known what "seek or accept" office meant. *Id.* at 1395.

In this case, Coplin's parents did not sign the Voluntary Consent to Discipline Form until after they had consulted with their attorney, Richard Hamlish.[12] Hamlish even attempted to negotiate the terms of

discipline with the school officials. (Richard Coplin declaration, paragraph 13).

Second, the record indicates that Coplin's father made a rational decision to sign the Consent to Discipline Form after evaluating the potential repercussions of not doing so. (Richard Coplin declaration, paragraph 14).[13] One factor weighing in favor of signing the Consent to Discipline Form was that it suspended the expulsion from September 8, 1993 to January 31, 1994 (the fall semester), provided that Coplin meet specified conditions: regular attendance; observance of school rules; sufficient academic progress; and resignation from the school band. (Declaration of Richard Simpson, exhibit D). By signing the form, Coplin's parents ensured that Coplin would not suffer more serious and adverse consequences, including not graduating with his friends and the incurring of approximately $5,000 for private school tuition.

Finally, the Consent to Discipline Form states in multiple places that Coplin would be entitled to a hearing, and that he was giving up that right.[14] The form could not be more

---

**11.** The court nevertheless refused to enforce the waiver on public policy grounds. Davies had argued that barring him from running for office affected not only himself, but also the voters, who were deprived of their opportunity to vote for him. *Id.* at 1396.

That argument is not available to Coplin, however. Coplin's waiver of his due process right to a hearing does not affect third parties, except to the extent that it relieves witnesses of the burden of having to testify against him. In that way, however, his waiver benefits, rather than infringes on, the rights on third parties.

**12.** At oral argument, Hamlish suggested that the Coplins had not waived the right to the hearing based on his advice, but that he had merely informed them of the law. The deposition of Coplin's father does not exactly reflect such a role: "But my practice, as you can tell, the way I went through this is I recognized the severity of the potential consequences to my son from the beginning. I retained counsel to advise me, and every step that I took, I believe I consulted with counsel." (Richard Coplin deposition, p. 76:19–23). In any case, what is relevant to the issue of waiver is not whether Coplin's family actually relied on Hamlish's advice, but rather whether Hamlish informed Coplin's family of the applicable statute.

**13.** Specifically, Coplin's father stated:

On May 17, 1993, I was faced with the prospect of my son not being able to return to school for this semester and losing a semester's credit and being expelled thereafter. Additionally, Kevin would not graduate with his friends; his graduation would be delayed one year. Additionally I was facing a payment of approximately $5,000.00 for private school. The alternative was signing the Voluntary Consent to Discipline form which I did. I felt for the good of my son and my family, I had no choice. Kevin was adamant in his demand to face a hearing and clear himself of any wrongdoing but I convinced him that signing the form was the expedient thing to do.
(Richard Coplin declaration, paragraph 14).

**14.** The Consent to Discipline Form states in relevant part:

All parties are in agreement that the below specified discipline may be put into effect by the District *without a formal hearing or other procedures as may be required by the Conejo Valley Unified School District Student Discipline Policy.* It is agreed that both the student and the parent or guardian have received and read a copy of the District's disciplinary rules and understand that, *except for this agreement, the parties would be entitled to a formal hearing.*
... Based on the foregoing, the student and the parent or guardian do hereby voluntarily

clear in terms of drawing the reader's attention to the right to a hearing.

The Court finds that the Ninth Circuit's reasoning in *Davies* is applicable to this case. Accordingly, the Court concludes that Coplin's parents knowingly and intelligently waived the right to a pre-expulsion hearing, and consented to the discipline imposed.

### 2. *Coercion*

■ Notwithstanding the analysis above, Coplin argues that his parents were coerced into signing the waiver.[15] What Simpson and Collins actually told Coplin is of course a factual issue for a jury to conclude. Assuming *arguendo* that Coplin's version of the facts is correct, Coplin still suffered no deprivation of civil rights.

California Education Code § 48918, titled "Rules and regulations governing expulsion procedure; Hearing; Notice; Findings; Order," states:

Written notice of the [expulsion] hearing shall be forwarded to the pupil at least 10 calendar days prior to the date of the hearing. The notice shall include: the date and place of the hearing; a statement of the specific facts and charges upon which the proposed expulsion is based; a copy of the disciplinary rules of the district which relate to the alleged violation; and *the opportunity for the pupil or the pupil's parent or guardian to appear in person or employ and be represented by counsel,* to inspect and obtain copies of all documents to be used at the hearing; *to confront and question all witnesses who testify at the hearing,* to question all other evidence presented, and *to present oral and documen-*

*tary evidence on the pupil's behalf, including witnesses.*

Cal.Educ.Code § 48918(b) (emphasis added). This statute directly contradicts what Simpson and Collins allegedly told Coplin's parents would take place at the hearing.

At oral argument, the Court asked Hamlish whether he was familiar with the contents of this statute. That discussion proceeded as follows:

HAMLISH: That's what this case is based on, Your Honor. I was familiar with it.

THE COURT: Well, but being familiar with that, you recommended to your client they sign a waiver of the hearing that they are entitled to by this statute.

HAMLISH: Your Honor, absolutely correct. As I stated the last time we were here, that section specifically states you were entitled to confront your accusers.

THE COURT: At a hearing.

HAMLISH: At a hearing.

(Transcript of Oral Argument, pp. 3:17–4:2).

Hamlish also informed Coplin's parents of the requirements of § 48918(b).[16] Thus, knowing what the statutory requirements of a hearing were, Coplin's parents waived their right to the hearing. The Court finds that this waiver was knowing and intelligent, and that it was not coerced.

### 3. *Futility*

■ Finally, at oral argument, Coplin's attorney argued that attending the hearing would have been futile. It has been long settled that futility will excuse the failure to exhaust administrative remedies. *Fraley v.*

---

consent to expulsion commencing on May 17, 1993.

By signing this consent form, both the student and the parent or guardian agree that (1) they have done so voluntarily, (2) they have received a complete copy of all of the Conejo Valley Unified School District Student Discipline Policy, *(3) they have had sufficient time to read such rules and procedures and knowingly waive all formal hearing rights,* and *(4) all parties are in agreement that a formal hearing is unnecessary,* and the manner of discipline recommended is appropriate.

(Simpson declaration, exhibit D) (emphasis added).

**15.** Coplin's father makes a conclusory assertion that: "There is no doubt in my mind that we (my wife Brenda, my son Kevin and I) were coerced into signing the Voluntary Consent to Discipline form by Simpson." (Richard Coplin declaration, paragraph 15).

**16.** During oral argument, the following exchange occurred:

THE COURT: However, before your client signed this waiver, they went to seek your advice. And you have told me that you were aware of this statute, and nevertheless, advised them to go ahead and waive their rights.

HAMLISH: Your Honor is absolutely correct. (Transcript of Oral Argument, p. 6:14–19).

*United States Bureau of Prisons,* 1 F.3d 924, 925 (9th Cir.1993); *El Rescate Legal Services v. EOIR,* 959 F.2d 742, 747 (9th Cir.1992); *Terrell v. Brewer,* 935 F.2d 1015, 1019 (9th Cir.1991); *cf. Brown v. Allen,* 344 U.S. 443, 447 [73 S.Ct. 397] 402, 97 L.Ed. 469 (1953) (holding that a habeas petitioner need not use state habeas procedures where he has already gone through the state's direct review).

However, an examination of such cases reveals that they are not applicable to this case, because futility applies where the plaintiff has already received an adverse decision, and where further administrative remedies are to be decided by the same people or under the same policies. *See Fraley,* 1 F.3d at 925; *cf. Brown,* 344 U.S. at 447, 73 S.Ct. at 402 (noting futility of seeking additional habeas review from a state supreme court that has already ruled unfavorably on direct appeal).

For example, in *Fraley,* the appellant was a habeas petitioner who had failed to exhaust her administrative remedies. She first sought administrative review from the local office of the Federal Bureau of Prisons in Spokane, Washington. That office denied her request, citing an official Bureau policy. She was told that if she wanted to continue her appeal, she was to contact the regional office of the Bureau. The Ninth Circuit held that Fraley's failure to pursue that additional appeal was excusable, because the regional office would almost certainly have cited the same Bureau policy, and therefore it would have been futile for her to continue her appeal. 1 F.3d at 925.

■ The Court finds that there is no evidence to support a finding of futility. Since Coplin bears the burden of proof on this issue at trial, the defendants need not negate his case; they may simply demonstrate the lack of an essential element in his case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The record is devoid of any hint that the hearing would have been futile; the members of the hearing board were entirely different from the ones who made the initial determination to suspend Coplin.[17]

Moreover, in the typical futility case, the plaintiff has been wronged in some way and is seeking relief for that wrong from a government agency. Futility refers to the fact that the administrative remedy will not cure the wrong. *E.g., Fraley,* 1 F.3d at 925. In this case, however, the wrong that Coplin alleges relates to the hearing itself. This distinction is subtle, but important. The fact that the school officials accused Coplin of sexual harassment is not a wrong in and of itself, even if their accusations were erroneous. The wrong occurs when they act on that accusation without having afforded Coplin enough procedural protection to guard against erroneous deprivations. In this case, the protection comes into play at the expulsion hearing. Since Coplin waived the hearing, he has suffered no wrong.

Coplin claims that the school board hearing would have been closed, with no record kept.[18] Nevertheless, Coplin had a number

---

17. Coplin does argue that the school board merely rubber-stamped Simpson's report without considering any evidence of his wrongdoing. However, the school board's action occurred after Coplin had waived his right to a hearing and his parents had signed a Voluntary Consent to Discipline Form. Under the Consent Form, the Coplins were essentially not contesting Simpson's recommendation, and therefore, assuming a proper waiver occurred, Coplin cannot now argue that the hearing would have been futile merely because in this circumstance the board accepted Simpson's report.

18. At oral argument, Hamlish appeared to concede that his client's case was completely anticipatory:

THE COURT: Don't you think that if you served a notice on this board citing this statute saying,

"I intend to exercise every one of these rights. I'm going to call witnesses. I want to cross-examine and confront the witnesses against my client," that you would have had a record then if they said: No, you can't do those things. You would then have had a record of denial establishing a violation of your rights. But this is totally anticipatory on your part—

HAMLISH: Your Honor—

THE COURT: —without having made an effort to assert the rights which you're clearly entitled to under the law.

HAMLISH: Your Honor, you are absolutely correct. One fault in everything you say. These are closed hearings with no transcripts and no record.

(Transcript of Oral Argument, p. 13:22–14:12).

of ways to create an evidentiary record documenting a violation of § 48918(b). For instance, a reasonably prudent attorney would have sent a letter to the school board officials, informing them of his intention to call witnesses on his behalf at the hearing, and waiting for reply correspondence denying him that right. Or a reasonable prudent attorney could have attended the hearing, and had the hearing turned out the way Coplin alleged, he would have been able to produce witnesses to testify that they sought to appear on his behalf at the hearing, but were barred from doing so by school officials.[19]

Accordingly, the Court rules as a matter of law that Coplin suffered no deprivation of his right to procedural due process relating to the pre-expulsion hearing, because he and his parents knowingly and intelligently waived the right to the hearing. Therefore, summary judgment is appropriately granted in favor of Simpson on this issue as well.

## II. Defendant Andress and Defendant Eklund's Motion for Summary Judgment

■ Coplin alleges that Andress and Eklund violated his right to due process by not identifying his accusers at the time they confronted him in Andress' office and by suspending him initially without adequate due process. The Court has already concluded that Coplin had no due process right to know the identities of his accusers for the pre-expulsion hearing; therefore, Coplin had no such right at the initial suspension hearing. See Goss v. Lopez, 419 U.S. 565, 583, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975) (holding that for suspensions of less than ten days, students are not entitled "to confront and cross-examine witnesses").

■ Coplin's other claim that he did not receive adequate due process when he was initially suspended by Andress and Eklund is similarly without merit.

Under *Goss,* a student facing a suspension of ten days or less must "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581, 95 S.Ct. at 740.

The notice can be given immediately after the alleged misconduct has occurred, however, and may be discussed informally with the student. *Id.* at 582, 95 S.Ct. at 740. Moreover, in cases of short suspensions, the student need not be given "the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." *Id.* at 583, 95 S.Ct. at 740.

By itself, Coplin's written statement demonstrated that the school officials had complied with these requirements. In this statement, Coplin wrote: "I (Kevin Coplin) have read many statements accusing me of sexual misconduct." (Andress Declaration, exhibit B). By Coplin's own admission, he was informed of the charges against him and presented with the evidence against him. His written statement demonstrates that he had the opportunity to tell his side of the story. *See, e.g., Lovell v. Poway Unified School District,* 847 F.Supp. 780, 783 (S.D.Cal.1994) (holding that a three day suspension for threatening a school counselor conformed with procedural due process where the student was called to the principal's office and told why she was being suspended); *Davis v. Churchill City School Board of Trustees,* 616 F.Supp. 1310, 1314–15 (D.Nev.1985) (holding that a six day suspension for fighting at a basketball game conformed with procedural due process where the student was called to the principal's office and told of the charges against him).

## III. Right to Remain Silent and Right to Counsel

Coplin raises, for the first time, the argument that his right to procedural due process

---

**19.** Hamlish's own analogy at the pretrial conference demonstrates his misconceptions. He analogized the situation to that of a criminal defendant who has lost a suppression motion, pled guilty, and is now appealing the ruling on the suppression motion. Using his example, however-

er, the correct analogy is that of a defendant who anticipates that his trial will be biased, pleads guilty, and now appeals. Without having gone through the trial, the defendant has not preserved any trial errors; indeed, no errors have actually occurred.

was violated when he was not informed at the time of his initial suspension that he had the right to remain silent and the right to counsel.

■ These claims are not properly before the Court, because Coplin has not filed a motion for leave to amend the complaint. It is generally inappropriate to grant leave to amend a complaint while summary judgment is pending. *Schlacter–Jones v. General Telephone of California,* 936 F.2d 435, 443 (9th Cir.1991). Moreover, the Court need not grant leave to amend if the additional claims sought to be added are futile. *See Foman v. Davis,* 371 U.S. 178, 182 [83 S.Ct. 227] 230, 9 L.Ed.2d 222 (1962) (listing "futility of the amendment" as a factor to consider in denying leave). For the reasons that follow, the Court determines that these additional claims would be futile, and therefore, the Court will decline to allow amendment.[20]

### 1. Right to Remain Silent

■ Coplin relies on *Caldwell v. Cannady,* 340 F.Supp. 835, 841 (N.D.Tex.1972), for the proposition that the school officials were required to inform him of his right to remain silent when they suspended him at first.

*Caldwell* was decided in 1972, three years before the Supreme Court's decision in *Goss v. Lopez, supra. Goss* dealt with procedural due process, a right guaranteed under the Fourteenth Amendment, whereas *Caldwell* dealt with the right against self-incrimination, a right guaranteed under the Fifth Amendment as incorporated against the States through the Fourteenth Amendment. That distinction is significant, because Coplin claims that his right to due process was violated when he was not informed that he had these rights. The Court need not reach the issue of whether he in fact did have this right, because *Goss* is dispositive on the issue of whether he had to be told that he had such a right at the time he was first suspended. *Goss* is applicable, because his initial suspension was for a short term of five days.

In setting out the requirements of a constitutional hearing, *Goss* made no mention of informing the student facing suspension that he or she had the right to remain silent. Accordingly, the Court finds *Caldwell* to be unpersuasive.

### 2. Right to Counsel

■ Coplin relies on *Gonzales v. McEuen,* 435 F.Supp. 460 (C.D.Cal.1977), for the proposition that the school officials should have informed him that he had the right to counsel when he was initially suspended. Although *Gonzales* does not suffer from the same fatal defect that *Caldwell* does, it does not support Coplin's position.

In *Gonzales,* the district court stated that

Goss clearly anticipates that where the student is faced with the *severe penalty of expulsion* he shall have the right to be represented by and through counsel, to present evidence on his own behalf, and to confront and cross-examine adverse witnesses.

435 F.Supp. at 467 (emphasis added). By its own terms, *Gonzales* therefore does not apply to the situation of an initial short-term suspension.

Moreover, Coplin's claim of not being informed of the right to counsel rests on due process grounds, not the constitutional right itself. Since *Goss* did not require that a student facing suspension be told that he have the right to counsel, Coplin's due process rights were not violated when he was not told that he had such a right. The Court need not determine whether such a right actually exists.

### Conclusion

For the foregoing reasons, the Court concludes that, taking facts in light most favorable to Coplin, he suffered no deprivation of civil rights. Accordingly, the motion by Defendants Simpson, Andress, and Eklund for

---

**20.** The Court also finds that Coplin unduly delayed in seeking to add these claims. Coplin knew or should have known at the time of filing the complaint that he had not been told that he

had the right to remain silent. His attempt to raise this issue is obviously the result of having done research in response to the Court's Order Setting Further Briefing.

summary judgment is GRANTED in its entirety.

IT IS SO ORDERED.