**In re the Matter of B.S., By His Parent, Jackie SCHNEIDER Plaintiff,**

v.

**BOARD OF SCHOOL TRUSTEES, FORT WAYNE COMMUNITY SCHOOLS, and Thomas Fowler–Finn, in his Official Capacity as Superintendent, Defendants.**

No. 1:02–CV–349.

United States District Court, N.D. Indiana, Fort Wayne Division.

Jan. 3, 2003.

**892**

Mark E. GiaQuinta, Haller and Colvin, Fort Wayne, IN, for plaintiff.

Wendy W. Davis, Matthew J. Elliott, Beckman Lawson Sandler Snyder and Federoff, Fort Wayne, IN, for defendants.

### MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

### I.  INTRODUCTION

The Plaintiff, B.S. ("B.S."), by his parent Jackie Schneider ("Schneider"), brings this civil rights action for injunctive relief, challenging the Defendants' decision to expel him from high school ostensibly for engaging in inappropriate sexual conduct on school grounds.[1]  Specifically, B.S. raises 14th Amendment procedural and substantive due process claims under 42 U.S.C. § 1983 (" § 1983"), and a state law claim seeking judicial review of the expulsion decision, pursuant to Ind.Code § 20–8.1–5.1–15.

Presently before the Court[2] are the par-

---

1.  B.S. originally brought this case in the Allen County, Indiana Superior Court, but the Defendants removed it to this Court on November 5, 2002.  The original complaint named as defendants Fort Wayne Community Schools ("FWCS") and Northrop High School ("Northrop"); however, on November 20, 2002, the Plaintiff filed an amended complaint dismissing Northrop from the case, but adding FWCS's superintendent, Thomas Fowler–Finn ("Fowler–Finn").  We will refer to FWCS and Fowler–Finn collectively as the "Defendants."

2.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

ties' cross-motions for summary judgment filed on November 22, 2002. Because B.S.'s motion for summary judgment referred to a diary that is outside the record, and an email message which B.S. attached to his amended complaint, the Defendants filed a motion to strike these materials or any reference to them as both unauthenticated and irrelevant. However, B.S.'s response to the motion to strike and his reply brief on his motion for summary judgment referred to more evidence outside the record, thus drawing a second motion to strike. The cross-motions for summary judgment and both motions to strike have been fully briefed and are ripe for ruling.

The record consists of B.S.'s Expulsion Hearing transcript ("Tr. at __"), the affidavit of FWCS's expulsion examiner Judith Platz ("Platz") ("Platz Aff. ¶ __"), FWCS's Behavior Code ("Behavior Code at __"), and other documents.

For the following reasons, both motions to strike will be GRANTED, the Defendants' motion for summary judgment will be GRANTED, and B.S.'s motion for summary judgment will be DENIED.

## II. MOTIONS TO STRIKE

Because it is more logical to do so, we will analyze the motions to strike in reverse order.

### 1. The Defendants' Second Motion to Strike

In their second motion to strike, the Defendants seek to strike any reference to a letter supposedly authored by Dr. Ronald Williams ("Dr.Williams"), or to the allegation that the FWCS school board, on December 9, 2002, amended the student Behavior Code.

The Defendants say that any reference to Dr. Williams's letter (*see* Pl.'s Resp. to Defs.' First Motion to Strike at 2 n. 1, & Pl.'s Reply Br. at 2 n. 1), should be stricken because it is not in evidence, and cannot be put in evidence because it would constitute inadmissible hearsay. B.S. apparently concedes the point, so we will grant the motion to this extent. *See, e.g., Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir.2002).

The Defendants also argue that any references to the recent amendments to the student Behavior Code (*see* Pl.'s Reply Br. at 2 n. 2) should be stricken as unsupported by the record, and simply irrelevant.

B.S. contends the modification is relevant because the Defendants by their action have effectively admitted that the "Law Violations" language employed in the Behavior Code was "a bit awkward" and overall demonstrates the strength of his argument. (Pl.'s Resp. to Defs.' Second M. to Strike at 2, citing Defs.' Resp. to Pl.'s M. for Summ. J. at 8–9.)

We agree with the Defendants that any references to FWCS's modification of the language employed in its disciplinary code is simply irrelevant to the issues presented in this case. After all, B.S. only challenges the Behavior Code as it existed on the day he was expelled. Accordingly, the Defendants' second motion to strike will be granted in full.

### 2. The Defendants' First Motion to Strike

Turning now to the Defendants' first motion to strike, they seek to strike any reference to a purported diary of the girl who allegedly performed oral sex on B.S. because there is no evidence such a diary exists. B.S. apparently concedes the point, and therefore the motion will be granted to this extent.

The Defendants also move to strike an email message the girl supposedly sent to an unidentified third party as both unauthenticated and irrelevant. In response, B.S. attempts to authenticate the

email by offering both the name and affidavit of the email's recipient. The Defendants, in their reply, do not question this effort to authenticate the email. Indeed, B.S. has offered an acceptable method for authenticating an email message. *See generally United States v. Siddiqui*, 235 F.3d 1318, 1322 (11th Cir.2000).

Nevertheless, the Defendants maintain that the email is irrelevant because Platz never considered or relied upon it in reaching her decision to expel B.S.[3] Indeed, to the extent the email relates to the state court claim for judicial review, it cannot be considered because it is outside the administrative record. *Family Development, Ltd. v. Steuben County Waste Watchers, Inc.*, 749 N.E.2d 1243, 1256 (Ind.Ct.App.2001) (court's review is limited to evidence in the administrative record). If, however, the email is being offered to address B.S.'s substantive due process claim, it is clearly irrelevant as it has no relation to FWCS's construction of its Behavior Code. Finally, because Platz, the ultimate decisionmaker, never considered the email, it is irrelevant to whether she accurately assessed the girl's credibility.[4]

Moreover, if what B.S. is contending is that the Defendants should have disclosed this supposedly exculpatory evidence prior to the expulsion hearing, as we shall see *infra*, they had no duty to do so. *See, e.g., Newsome v. Batavia Local School Dist.*, 842 F.2d 920, 925 (6th Cir.1988); *Craig v. Selma City School Bd.*, 801 F.Supp. 585, 593 (S.D.Ala.1992).

Accordingly, because B.S. concedes that references to the diary should be stricken and because the email attached to the amended complaint is irrelevant, we will grant the Defendants' first motion to strike.

### III. FACTUAL AND PROCEDURAL BACKGROUND [5]

On October 9, 2002, Cheryl Strader ("Strader"), an assistant principal at Northrop, received a phone call from a concerned parent regarding inappropriate sexual conduct that allegedly occurred on school grounds between several football players and a female student manager. (Tr. at 4.)

Strader immediately questioned the girl, who admitted to consensual sexual encounters on school grounds with several boys (involving, at various times, intercourse, oral sex, and fondling). (*Id.*) The main concern at present is that one of the boys implicated was B.S., who purportedly received oral sex from the girl in a Northrop locker room. (Tr. at 4–5.)

This led Northrop officials to question each of the boys, and the girl, and on October 10, 2002, B.S. denied to Northrop principal Timon Kendall ("Kendall"), any involvement with the girl. (*Id.; see also* Platz Aff., Ex. 2)

Subsequently, Strader interviewed B.S. about the allegations, who admitted that he knew that one of the managers of the football team was providing oral sex to the team. (Tr. at 4–5) B.S. then indicated that

---

**3.** The email sender admits to having sex with people other than the recipient, whom she professes to love, but threatens that if this information gets around, she will claim she was raped by "the hole [sic] football team," including the recipient.

**4.** Indeed, as far as can be determined, apparently none of the school authorities involved with B.S.'s case considered the email or even

knew of its contents. (*See* Tr. at 20.) It is also unclear how this email helps B.S. since the girl, if truly the sender, did not carry out her threat.

**5.** The following recitation excludes any reference to those matters that were subject to the two motions to strike discussed *supra*, but otherwise it is drafted in a light most favorable to B.S.

while he almost allowed the girl to perform oral sex on him in the locker room, he changed his mind before she started. (*Id.*; *see also* Platz Aff., Ex. 3.) Later, according to Strader, B.S. recanted his story and claimed the incident never occurred. (Tr. at 5)

Indeed, in a written statement, B.S. claimed no involvement with the girl, and that any allegations to the contrary were merely school yard rumors that surfaced after he was briefly alone with her in a locker room. (Platz Aff., Ex. 2.) In a second written statement, B.S. allowed that the girl had actually approached him in the locker room asking if he wanted to "do something" in the shower area. (Tr. at 5; Platz Aff., Ex. 3.) He claimed that once in the shower area the girl got on her knees and attempted to pull his pants down, but he stopped her and left the locker room. (*Id.*)

In the course of their investigation, Northrop officials received a statement from another student who wrote that "[B.S.] and [another student] told me that [the girl] gave them oral sex, I don't know if they were joking trying to make her seem real nasty or not but they were two that actually said yes she did." (Tr. at 6; See also, Platz Aff. Exh. 6.) In addition, Judy Delamarter ("Delamarter"), the treasurer at Northrop, offered a statement recounting that she had overheard B.S. tell another implicated student that "[t]hey can't pin it on us because it's her word against ours." (Tr. at 5–6; See also, Platz Aff. 5, 8.)

As a result of its investigation, FWCS sought to expel B.S. through the end of the school year for a violation of Rule 22 of the student Behavior Code, which prohibits inappropriate sexual behavior on school grounds,[6] and notified B.S. of the charges against him. (Tr. at 1; Defs.' Ex. B, Written Charge and Req. for Expulsion and Appointment of Expulsion Examiner.) After receiving notice of the charges, B.S., with his attorney, appeared at an expulsion hearing before Platz on October 16, 2002; FWCS was represented by Michael Schnelker ("Schnelker"), an assistant principal at Northrop. (Tr. at 1, 3–6.)

At the outset, counsel for B.S. raised three procedural objections: the expulsion hearing was scheduled for only thirty (30) minutes and this was insufficient;[7] FWCS was apparently not going to provide him with an opportunity to review the evidence against B.S. prior to the hearing (i.e., various student statements); and B.S. had not received the names of the students who had implicated him. (Tr. at 3, 10.)

Once the hearing proceeded, Schnelker summarized FWCS's investigation and noted that the girl involved had claimed under oath that she performed oral sex on B.S. (Tr. at 4–6.) Schnelker also read into the record the statements of B.S., the statement of the student who described B.S.'s admission, Strader's description of her investigation, and the statement of Delamarter. (*Id.*) Finally, Schnelker referred to the girl's list of the boys involved and her conduct with them, including a crude written reference to having performed oral sex on B.S. (Tr. at 5, 17–18.)

---

**6.** FWCS's Behavior Code divides its disciplinary rules into three general categories: "Attendance Violations," "Behavior Violations," and "Law Violations." Rule 22, which is classified as a Law Violation, prohibits "[p]articipating in inappropriate sexual behavior including sexual harassment or [p]ublic indecency on school property, at school activities, going to or from school events, or at any time where behavior may interfere with school purposes."

**7.** The hearing ultimately went on to exceed thirty (30) minutes in any event. (Tr. at 21.) In fact, despite Platz's observation that the initial time limit had expired, the transcript shows that the hearing continued on for another seven pages. (*Id.*)

Counsel for B.S. cross-examined Schnelker, presented evidence on behalf of B.S., and argued B.S.'s case. B.S. testified that the girl did not perform oral sex on him, and reiterated that his second written statement was an accurate account of what had occurred. (Tr. at 27.)

Based on the evidence presented, Platz determined that B.S. should be expelled through the end of the school year, but that he was eligible to conditionally attend an alternative learning program for the remainder of the 2002–2003 school year. (Platz Aff., Ex. 9, Expulsion Examiner's Written Summary of Evidence; Determination and Notice of Action Taken, at 7.)

B.S. timely appealed to Jerry White, the Superintendent/Designee, who modified the expulsion by allowing B.S. to return for the spring term of 2003 and, if he completed the alternative learning program with no violations, the record of his expulsion would not be forwarded to any colleges. (Platz Aff. ¶ 5–6; Pl.'s Ex. D.) B.S. then filed a final appeal to the FWCS school board, (Platz Aff. ¶ 7), which apparently affirmed the modified expulsion.

In this case, B.S. contends the Defendants violated his procedural due process rights because they failed to provide him with either the names of his accusers or the documents relied upon at the expulsion hearing, and because they did not allow him to cross-examine his student accusers. B.S. also argues that the Defendants violated his substantive due process rights by expelling him for a so-called "Law Violation" under the school's Behavior Code because even if what the girl said is true, there was no violation of Indiana Law.

The Defendants maintain that there was no procedural due process violation because there is no due process right to learn the identities of accusers, or cross-examine them either, at or before an expulsion hearing. (Defs.' M. for Summ. J. at 10) (citing *Newsome,* 842 F.2d at 925).

The Defendants also contend there was no substantive due process violation because FWCS is entitled to construe its own Behavior Code. Finally, the Defendants claim that under state administrative law, the expulsion decision was neither arbitrary nor capricious.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512; *North Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.,* 89 F.3d 452, 455 (7th Cir.1996); *In Re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988).

No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the non-moving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact". *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir.1988); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983); *Guenin v. Sendra Corp.*, 700 F.Supp. 973, 974 (N.D.Ind.1988). In ruling on a summary judgment motion, the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence nor the credibility of witnesses. *Anderson*, 477 U.S. at 249-51, 106 S.Ct. at 2511; *North Am. Van Lines, Inc.*, 89 F.3d at 455. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Ill. Nat'l Bank*, 704 F.2d 361, 367 (7th Cir.1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed. R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *First Nat'l Bank of Cicero v. Lewco Sec. Corp.*, 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. at 2512.

## V. DISCUSSION

### 1. The Defendants' Motion for Summary Judgment [8]

#### A. The Procedural Due Process Claim

The Fourteenth Amendment prohibits the Defendants and other state actors from depriving "any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, and the task here is to determine whether the Defendants violated that provision. *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 616 (7th Cir.2002).

---

**8.** In their motion for summary judgment, the Defendants contend that B.S. failed to exhaust his administrative remedies prior to filing suit. However, because the School Board has now apparently affirmed the modified expulsion, the exhaustion argument is deemed moot.

Indeed, there is no dispute that B.S. has a property interest in his free public education, *see Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), *Martin v. Shawano–Gresham School Dist.*, 295 F.3d 701, 705–06 (7th Cir.2002); IND. CONST. art. 8, § 1 ("it shall be the duty of the General Assembly ... to provide, by law, a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all."), so we turn to the question of how much process B.S. was due. *See Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ("[o]nce it is determined that due process applies, the question remains what process is due.").

■ In *Goss v. Lopez*, the United States Supreme Court first addressed what process is due in the school discipline context. Although *Goss* specifically limited its holding "to the short suspension, not exceeding 10 days," *Goss*, 419 U.S. at 584, 95 S.Ct. 729, it "nevertheless establish[ed] the *minimum* requirements for long-term expulsions as well." *Newsome*, 842 F.2d at 927 (emphasis in original). Thus, to comport with due process, suspension and expulsion procedures must provide the student with a meaningful opportunity to be heard. *Remer v. Burlington Area School Dist.*, 286 F.3d 1007, 1010–11 (7th Cir.2002) (citing *Linwood v. Bd. of Educ.*, 463 F.2d 763, 769–70 (7th Cir.1972)). The proceedings need not, however, take the form of "a judicial or quasi-judicial trial;" so long as the student is given notice of the charges against him, notice of the time of the hearing and a full opportunity to be heard, the expulsion procedures do not offend due process requirements. *Id.; see also Goss*, 419 U.S. at 581, 95 S.Ct. 729 (minimum

due process requirements for suspension include "oral or written notice of the charges ... and, if he denies them, an explanation of the evidence the authorities have against him and an opportunity to present his side of the story.").

B.S. concedes that he received adequate notice of the charges and the hearing, but contests whether he received a full opportunity to be heard.

■ To determine whether the Plaintiff received a full opportunity to be heard, we must apply the flexible, policy-oriented balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *See Newsome*, 842 F.2d at 923–24; *Caston v. Benton Public Schools*, 2002 WL 562638, *3 (E.D.Ark. April 11, 2002); *Rippy v. Bd. of Sch. Trustees*, 2000 WL 689340, *3 (S.D.Ind. Feb.4, 2000). In *Mathews*, the Supreme Court explained that courts must consider (1) the private interest that will be affected by the state action, (2) the risk of an erroneous deprivation of this private interest through the procedures used by the state, and the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interest, including the function involved and the fiscal and administrative burdens that an additional or alternative procedure would entail. *Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

As to the first *Mathews* factor, there is no dispute that B.S. has an important interest at stake in this case. Indeed, while B.S. continues to attend classes at the alternative learning program, and will be able to return to Northrop for the Spring 2003 semester, his expulsion may "seriously damage his standing with [his] fellow pupils and [his] teachers[.]"[9] *See Goss*,

---

9. We note that B.S.'s interest is somewhat lessened because the record of his expulsion will not be forwarded to any colleges if he completes the alternative learning program with no additional violations. (Platz Aff. ¶ 6.) Thus, the usual risk that an expulsion will

419 U.S. at 575, 95 S.Ct. 729. Therefore, we conclude that B.S. has a strong interest in ensuring that his expulsion was warranted.

However, the second *Mathews* factor, the risk of an erroneous deprivation of that interest through the procedures employed, is very low and weighs in favor of the Defendants. B.S. complains that FWCS refused him the name of his accusers, the opportunity to cross examine them, and copies of the documents FWCS used in his expulsion hearing. However, as even B.S. recognizes, the clear weight of authority holds that a student facing an expulsion hearing does not have the right to cross-examine witnesses or even learn their identities. *See, e.g., Newsome,* 842 F.2d at 925; *Brewer ex rel. Dreyfus v. Austin Independent School Dist.,* 779 F.2d 260, 263 (5th Cir.1985); *Caston,* 2002 WL 562638; *Witvoet v. Herscher Comm. Unit School Dist. No. 2,* 1998 WL 1562916, *4 (C.D.Ill. May 27, 1998); *Smartt v. Clifton,* 1997 WL 1774874, *16 (S.D.Ohio Feb.10, 1997); *L.Q.A. ex rel. Arrington v. Eberhart,* 920 F.Supp. 1208, 1219 (M.D. Ala. 1996), *aff'd* 111 F.3d 897 (11th Cir.1997); *Coplin v. Conejo Valley Unified School Dist.,* 903 F.Supp. 1377 (C.D.Cal.1995).

This conclusion stems from the recognition that while the "value of cross-examination to the discovery of truth cannot be overemphasized," in the school discipline context,

> [t]he value of cross-examining student witnesses ... is somewhat muted by the fact that the veracity of a student account of misconduct by another student is initially assessed by a school administrator ... who has, or has available to him, a particularized knowledge of the student's trustworthiness.... Consequently, the process of cross-examining the student witness may often be merely duplicative of the evaluation process undertaken by the investigating school administrator.

*Newsome,* 842 F.2d at 924.

Nevertheless, B.S. attempts to distinguish this case by utilizing the rather narrow exception recognized in *Rippy,* 2000 WL 689340, *6. There, the District Court held that if the student facing expulsion sought to learn the identity of his anonymous accusers solely to attack their *credibility* or *sincerity,* presumably through cross-examination or the introduction of other evidence, then the rationale of *Newsome* and its progeny would apply. *Id.* However, because the student in *Rippy* was challenging the *reliability* of his accusers' identification of him, which apparently was based on an outdated yearbook photo, then the school administrator's investigation had not sufficiently guarded against the possibility that the accusers had misidentified the student. *Id.*

Here, B.S. claims that because he denies participating in the sexual act alleged, he should have been given the chance to cross examine the girl to test her reliability. (Pl.'s Resp. to Defs.' M. for Summ. J. at 6–7.) However, unlike *Rippy,* there is no question the girl knew B.S., identified him, and recorded not only the sexual act she performed with him but also its location. In fact, B.S. does not suggest that the girl was mistaken in identifying him, but only challenges her sworn statement recounting that the sexual act was actually consummated. On these facts, there is no doubt the girl reliably identified B.S., and the school administrators were entitled to believe her version of the story. *Cf., Rippy,* 2000 WL 689340, at * 6 ("the court cannot say definitively that [the principal's] investigation guarded effectively against the possibility that the accusing students made

---

interfere with later opportunities for higher education or employment, *see Goss,* 419 U.S.

at 575, 95 S.Ct. 729, is significantly reduced, if not removed completely.

honest mistakes in identifying [the student]."").

Still, B.S. suggests that cross-examination was necessary because the girl may have been motivated to fabricate her claim against him, thus making her story unreliable. However, this claim targets the girl's credibility, not the reliability of her identification. And since it was the job of the school administrators to assess the girl's veracity, *see Newsome*, 842 F.2d at 924, the Defendants did not err in preventing the Plaintiff from cross-examining her. Indeed, both Strader and Schnelker certainly had particularized knowledge of the girl's trustworthiness, since they knew her either firsthand, or through school records, such as her "disciplinary history, which can serve as a valuable gauge in evaluating the believability of [her] account." *Id.*

Moreover, the presence of corroborating evidence further diminishes the potential value of cross-examination at the expulsion hearing. *See cf., Rippy*, 2000 WL 689340 at *3. For example, B.S.'s own admissions to Strader and in his second written statement, corroborate all but the sexual act itself, and another student claims B.S. confessed that the girl provided him with oral sex. Moreover, the girl's credibility is bolstered by her catalogue of sexual encounters with 12 male students, one of whom was B.S., particularly since 10 others have apparently confessed to the sexual acts alleged. (Pl.'s M. for Summ. J. at 8, as incorporated by Pl.'s Resp. to Defs.' M for Summ. J. at 5.) Certainly, such corroborating evidence was sufficient for FWCS administrators to accurately gauge the girl's credibility, further diminishing the value of any cross-examination.

■ B.S. also claims that he should have been provided with copies of the documents and written witness statements that FWCS relied upon in the expulsion hearing, presumably so he could challenge their sufficiency, or cross-examine their authors. However, at least two other courts have extended the reasoning of *Newsome* and its progeny to documents that might be useful in preparing for cross-examination. *See Craig v. Selma City School Bd.*, 801 F.Supp. 585, 593 (S.D.Ala.1992) ("[T]he Eleventh Circuit has made clear that a student has no constitutional right to cross examine witnesses at an expulsion hearing ... so that a student can clearly have no federal right to obtain materials to prepare for cross-examination.") (citations omitted); *L.Q.A.*, 920 F.Supp. at 1219. We find these cases persuasive. Certainly, the school administrators were capable of assessing the veracity of the witness statements both before and after they were reduced to writing, and therefore there was little value in providing these statements to B.S. for cross-examination.

Thus, under the *Mathews* framework, the risk of an erroneous deprivation of B.S.'s interests was very low.

Turning to the third *Mathews* factor, we must weigh the value of providing B.S. with the names of undisclosed accusers, their statements, and possible cross-examination, against the burden that such practices would place on the school administration. *Mathews*, 424 U.S. at 335, 96 S.Ct. 893; *Newsome*, 842 F.2d at 924. As several courts have previously noted, in light of the increasing challenges schools face in maintaining order and discipline, requiring schools to permit the confrontation of student witnesses or even to disclose their identities in expulsion hearings would be overly-burdensome and unrealistic. *See Newsome*, 842 F.2d at 924–25; *Caston*, 2002 WL 562638, *5; *Coplin*, 903 F.Supp. at 1382; *Graham v. Knutzen*, 351 F.Supp. 642, 669 (D.Neb.1972). The purpose behind the administrative expulsion process, and the expulsion hearing itself, is to avoid the formalistic trappings and cost of adver-

sarial litigation. *Osteen v. Henley,* 13 F.3d 221, 225–26 (7th Cir.1993); *Gorman v. University of Rhode Island,* 837 F.2d 7, 16 (1st Cir.1988); *see cf., Remer,* 286 F.3d at 1010–11 (expulsion proceedings need not take the form of "a judicial or quasi-judicial trial"). It merely states the obvious to suggest that formalized disciplinary proceedings would increase cost and complexity,

> to the detriment of discipline as well as ... [FWCS's] fisc. Concern is frequently voiced about the bureaucratization of education, reflected for example in the high ratio of administrative personnel to faculty at all levels of American education today. We are reluctant to encourage further bureaucratization by judicializing ... disciplinary proceedings, mindful also that one dimension of academic freedom is the right of academic institutions to operate free of heavy-handed governmental, including judicial, interference.

*Osteen,* 13 F.3d at 225–26

Furthermore, FWCS has a strong interest in protecting students who report classmate misconduct. "Those students may be understandably reluctant to come forward with information if they are faced with the prospect of formal cross-examination by the offending student or his attorney," *Caston,* 2002 WL 562638, at *5, or the unsettling prospect of ostracism or even physical reprisals at the hands of their peers. *Id.; Newsome,* 842 F.2d at 925 ("[w]ithout the cloak of anonymity, students who witness [misconduct] will be much less likely to notify school authorities, and those who do will be faced with ostracism at best and perhaps physical reprisals."); *Graham,* 351 F.Supp. at 666 ("students who give information ... are often the subject of reprisal from students about whom information was given.").

Thus, in balancing the various *Mathews* factors, the Defendants' interests in avoiding administrative burdens associated with more formalized expulsion proceedings and protecting student witnesses greatly outweigh the little value derived from providing B.S. with names of his accusers, their written statements, and the opportunity to cross-examine them. "The question presented here is not whether the hearing was ideal, or whether its procedure could have been better. Rather, in all cases, the inquiry is whether, under the particular circumstances presented, the hearing was fair, and accorded the individual with the essential elements of due process." *Gorman,* 837 F.2d at 16. We conclude, based on the facts in this case, that the Defendants afforded B.S. with a full and fair opportunity to be heard.

Accordingly, we will grant the Defendants' motion for summary judgment on B.S.'s procedural due process claim.

## B. The Substantive Due Process Claim

■ The touchstone of the Fourteenth Amendment's due process clause is the "protection of the individual against arbitrary action of government." *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 1716, 140 L.Ed.2d 1043 (1998). However, the appropriate standard for analyzing a substantive due process claim depends on whether "legislation or a specific act of a governmental officer is at issue." *Dunn v. Fairfield Community High School Dist. No. 225,* 158 F.3d 962, 965 (7th Cir.1998).

When, as here, the focus is on legislation (or more accurately, regulation), the Court must decide whether it interferes with "certain fundamental rights and liberty interests." *Id.* at 966 (quoting *Washington v. Glucksberg,* 521 U.S. 702, 719, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)). The Supreme Court has already decided that a student's interest in education is not a

fundamental right. *See San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *see also Dunn,* 158 F.3d at 966 ("Although students may have some substantive due process rights while they are in school ... education itself is not a fundamental right."). Thus, the legislation (or regulation) will be upheld if it has "a reasonable relation to a legitimate state interest," *Glucksberg,* 521 U.S. at 722, 117 S.Ct. 2258, or as the Seventh Circuit states somewhat differently, it will be upheld "unless it is wholly arbitrary." *Dunn,* 158 F.3d at 966.

B.S. claims FWCS's Behavior Code is wholly arbitrary because it punishes "Law Violations" even when no law was actually violated. Specifically, B.S. argues that because Rule 22 falls under what FWCS chose to generally describe as "Law Violations," it must necessarily follow that there was some transgression of a local, state, or federal law before the rule can be the basis for an expulsion.

However, FWCS is clearly entitled to considerable discretion in construing its disciplinary rules. *See Wood,* 420 U.S. at 326, 95 S.Ct. 992 (" § 1983 does not extend the right to relitigate in federal court ... the proper construction of school regulations."); *Board of Educ. of Rogers, Arkansas v. McCluskey,* 458 U.S. 966, 970, 102 S.Ct. 3469, 73 L.Ed.2d 1273 (1982). Indeed, in *Wood,* the Eighth Circuit interpreted a school regulation's use of the term "intoxicating beverages," as being "linked" to a state statute defining "intoxicating liquor." *Wood,* 420 U.S. at 324, 95 S.Ct. 992. However, in rejecting this interpretation, the Supreme Court noted that "[t]estimony at trial ... established convincingly that the term 'intoxicating beverage' in the school regulation was not intended at the time of its adoption ... to

be linked to the definition in the state statutes or to any other technical definition of 'intoxicating.'" *Wood,* 420 U.S. at 324, 95 S.Ct. 992. Thus, the Supreme Court concluded that courts are "ill advised to supplant the interpretation of the regulation[s] of those officers who adopted [them] and are entrusted with [their] enforcement." *Wood,* 420 U.S. at 325, 95 S.Ct. 992.[10]

Nevertheless, B.S. attempts to distinguish *Wood* and *McCluskey* from this case because the school regulations in those cases did not specifically define the prohibited substances or otherwise cross-reference those terms to a statutory or regulatory definition. (Pl.'s M. for Summ. J. at 11–15, as incorporated by Pl.'s Resp. to Defs.' M. for Summ. J. at 3.) In contrast, B.S. argues that Rule 22 is specifically "linked" to some unidentified criminal statute because it falls under the heading "Law Violations."

However, the facts and reasoning of *Wood* and *McCluskey* cannot be so easily ignored. Indeed, B.S. apparently would have this Court apply some sort of legal gloss to a simple school behavioral code violation, the same type of analysis that was rejected by the Supreme Court in *Wood* and *McCluskey.* This is particularly true where the rule, like Rule 22 here, contains no cross-reference to any specific law. *See, e.g., Wood,* 420 U.S. at 324, 95 S.Ct. 992. In fact, a number of things that FWCS has chosen to characterize as "Law Violations" actually prohibit lawful, but in a school context, disruptive behavior. *See, e.g.,* Behavior Code Rules 13 (gambling), 15 (possession of fireworks), 19 (possession and/or use of tobacco products), 24 (possession of pornography), 26 (group or gang involvement including the display of gang

---

**10.** Similarly, in *McCluskey,* the Supreme Court, relying on *Wood,* held that the school board was free to interpret the term "drugs," as used in the school regulations, to include alcohol. *McCluskey,* 458 U.S. at 970–71, 102 S.Ct. 3469.

colors or signs). Moreover, if FWCS truly felt the need to "link" Rule 22 to some outside source of law, it would have done so expressly, as it did in Rule 34. *See id.*, Rule 34 (prohibiting "involvement in any conduct on school premises ... which violates local, state, or federal law ....")

In short, FWCS was entitled to construe its own regulations, and it has not done so unreasonably or arbitrarily in this case.[11] The Behavior Code provides FWCS with the authority to expel a student for engaging in inappropriate sexual conduct on school property, and certainly engaging in oral sex in a locker room falls into that category. At worst, FWCS's classification of Rule 22 as a "Law Violation[ ]" is somewhat misleading, however, "[i]t is not the role of federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *Wood,* 420 U.S. at 326, 95 S.Ct. 992. Moreover, B.S. does not contend that since oral sex in this instance did not constitute a violation of state law he somehow thought it was permissible on school grounds. *See, e.g., Wood,* 420 U.S. at 325, 95 S.Ct. 992 ("The girls themselves admitted knowing at the time of the inci-

dent that they were doing something wrong which might be punished.").

Accordingly, we will grant the Defendants' motion for summary judgment on the Plaintiff's substantive due process claim.

## C. The Plaintiff's State Law Claim

■ Having disposed of all of the Plaintiff's federal claims, the Court may, in its discretion, eschew the "usual practice" of dismissing without prejudice the remaining state law claims that are here under the Court's supplemental jurisdiction, 28 U.S.C. § 1367(c), particularly when it "has already invested substantial judicial resources" or when the resolution of the state law claims is clear. *See Groce v. Eli Lilly & Co.,* 193 F.3d 496, 501–02 (7th Cir.1999); 28 U.S.C. § 1367(a). Because both factors are present here, we turn to the Plaintiff's remaining state law claim.

■ B.S. seeks judicial review of his expulsion hearing ostensibly under Indiana's pupil discipline statute, Ind.Code § 20–8.1–5.1–15 (1995),[12] claiming the decision to expel him was "arbitrary and capricious." [13] (Pl.'s Reply Br. at 7–8.)

---

11. We know that the School Board, which adopted Rule 22 in the first place, apparently agreed with the school administrator's interpretation and application here, since they affirmed the modified expulsion on appeal.

12. Ind.Code § 20–8.1–5.1–15 provides "Judicial review of a governing body's action under this chapter by the circuit or superior court of the county in which a student who is the subject of the governing body's action resides is limited to the issue of whether the governing body acted without following the procedure required under this chapter."

13. The parties debate whether the "arbitrary and capricious" standard is the appropriate standard to employ in this instance. Part of the confusion surrounding the applicable standard arises because prior to July 1, 1995, the predecessor to Ind.Code § 20–8.1–5.1–15,

Ind.Code § 20–8.1–5–11(d), allowed courts to review the actions of school corporations to determine whether they acted arbitrarily, capriciously, without substantial justification, or unlawfully. *See West Clark Comm. Schools v. H.L.K.,* 690 N.E.2d 238 (Ind.1997) (quoting *Matter of H.L.K.,* 666 N.E.2d 80, 85 (Ind.Ct. App.1996)). The 1995 amendment ostensibly limited the scope of judicial review to simply whether the school board complied with the expulsion procedures provided by Ind.Code § 20–8.1–5.1–13. *Id.* However, the Indiana Supreme Court recently held that because a school board is an administrative body, Ind. Code 20–4–1–3(5), there is a constitutional right to judicial review of its expulsion decisions under the arbitrary and capricious standard of review. *South Gibson School Bd. v. Sollman,* 768 N.E.2d 437, 441 (Ind.2002). Accordingly, we will apply that standard.

The Supreme Court of Indiana has held that an action of a school board, as an administrative body, is "arbitrary and capricious only where there is no reasonable basis for the action," and that the burden of proving this falls on the party attempting to upset the school board's decision. *South Gibson School Bd.*, 768 N.E.2d at 441 (quoting *Indiana Civil Rights Comm'n v. Delaware Cty. Cir. Ct.*, 668 N.E.2d 1219, 1221 (Ind.1996)).

To show that FWCS's decision to expel him was arbitrary and capricious, B.S. raises the same argument he advanced in his substantive due process claim, namely that he cannot be expelled under Rule 22, a so-called "Law Violation[ ]," without a showing that he violated some Indiana Law. (*See* Pl.'s Resp. to Defs.' M. for Summ. J. at 7–8.) However, as discussed *supra*, FWCS is entitled to considerable deference in construing its Behavior Code, and it has not done so arbitrarily in this case. *See Wood*, 420 U.S. at 326, 95 S.Ct. 992; *McCluskey*, 458 U.S. at 970, 102 S.Ct. 3469; *South Gibson School Bd.*, 768 N.E.2d at 441 (quoting *Wood* in arbitrary and capricious discussion).

Indeed, school corporation personnel have the right, subject to certain limitations, to take "any disciplinary action necessary to promote student conduct that conforms with an orderly and effective educational system." Ind.Code § 20–8.1–5.1–3. Here, it was reasonable for FWCS to enact a disciplinary rule prohibiting inappropriate sexual behavior on school grounds, and to then find that engaging in oral sex in a locker room violated this rule. Further, based on all of the evidence considered by FWCS, we believe Platz's finding that B.S. engaged in inappropriate sexual behavior, in violation of Rule 22, and that he should be expelled, was clearly

reasonable. This conclusion is reached not merely because there was sufficient evidence to support it, but also because "[s]chool officials, with their expertise in such matters, are in the best position to determine in their discretion what actions are reasonably necessary to carry out school purposes[.]" *South Gibson School Bd.*, 768 N.E.2d at 442 (quoting *Board of School Trs. v. Barnell*, 678 N.E.2d 799, 805 (Ind.Ct.App.1997))

Accordingly, B.S. has failed to carry his burden of demonstrating that the Defendants acted arbitrarily and capriciously in expelling him for violating Rule 22 of the Behavior Code, and therefore the Defendants are entitled to summary judgment on his state law claim.

### 2. B.S.'s Motion for Summary Judgment

Because we conclude that the Defendants' motion for summary judgment should be granted in full as a matter of law, B.S.'s motion for summary judgment, which is a mirror-image of the Defendants' motion, must be denied.

### CONCLUSION

For the foregoing reasons, the Defendants' motion to strike is GRANTED, their second motion to strike is GRANTED, and their motion for summary judgment is GRANTED. B.S.'s motion for summary judgment is DENIED. The clerk is directed to enter judgment in favor of the Defendants and against the Plaintiff.[14]

---

**14.** As a result of these rulings, B.S.'s November 20, 2002, motion to consolidate is deemed moot.